No. 69,897

STATE OF KANSAS, *Appellee*, v. NASIF GADELKARIM, *Appellant*.

(887 P.2d 88)

Opinion filed December 22, 1994.

*Rick Kittel,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*Debra S. Peterson,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Robert T. Stephan,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant was convicted of first-degree murder and sentenced to life imprisonment. Defendant appeals, claiming:

(1) trial court misconduct prejudiced the jury; (2) the jury was allowed to consider that defendant had invoked his right to remain silent; (3) hearsay testimony and a prior conviction were improperly admitted; (4) the prosecutor improperly struck a black prospective juror; and (5) the trial court failed to instruct on a lesser included offense.

Nasif Gadelkarim came to the United States from Egypt in 1974. In 1980, Gadelkarim began dating Deborah Cagle, who had two children, A. and B. A short time later, Gadelkarim, Cagle, and Cagle's children began living together. Gadelkarim and Cagle had a stormy relationship. Gadelkarim was known to physically abuse Cagle. Testimony at trial indicated these problems may have been related to Gadelkarim's excessive consumption of alcohol. In April 1988, Gadelkarim, Cagle, and B. moved to Clearwater, Kansas, to operate the USA Restaurant. Their residence was a house directly behind the restaurant.

Sometime prior to Gadelkarim, Cagle, and B. moving to Clearwater, A. began living with Cagle's sister, Christine Moline. A. did not move to Clearwater because Gadelkarim had sexually abused him. Gadelkarim warned A. that if he told anyone about the abuse, Gadelkarim would kill him and his mother. A. eventually told Moline of the abuse. The police were informed, and Gadelkarim was charged with indecent liberties with a child.

Near the end of Gadelkarim's indecent liberties trial, he told Cagle that if he had to go to prison he would kill himself and take others down with him. On November 30, 1988, Gadelkarim was convicted of taking indecent liberties with A. Gadelkarim remained free on bond pending imposition of sentence.

Gadelkarim told Mary Rumery, a waitress at the USA Restaurant, that he had plans for Saturday, December 3. Gadelkarim asked Rumery to manage the restaurant because he was going to "take care of" Cagle.

Sometime after 10:00 on the evening of December 2, 1988, Gadelkarim and Cagle stopped at Roger's Place in Clearwater, where Gadelkarim consumed four or five mixed drinks. As they were leaving the club sometime between midnight and 1:30 a.m., Gadelkarim approached the bar and left a tip for the proprietor.

Gadelkarim also left some money on the bar for two female patrons. Cagle picked up the money. Gadelkarim took it away from her and gave it back to the two women. Cagle picked it up again and told Gadelkarim he should not be throwing his money around. Gadelkarim then physically forced Cagle out the door of the club. As Gadelkarim and Cagle were leaving, Gadelkarim asked Cagle if she wanted to start something. Cagle drove back to their residence alone. Gadelkarim walked home.

The next morning, Rumery went to the restaurant to begin work, but Cagle was not there. Rumery drove to the residence and knocked. Gadelkarim opened the door and told Rumery that Cagle was getting dressed. Rumery went back to her car, waited 10 or 15 minutes, and then left.

At 7:36 a.m. on December 3, Gadelkarim called 911 and told the operator that he had killed his girlfriend and wanted someone to come pick him up. Clearwater police were dispatched to the USA Restaurant. After searching the restaurant, the police determined that no one was inside. Officers went to the residence and called Gadelkarim. Gadelkarim stepped onto the porch and stated, "I just shot my girlfriend, no big deal," or words to that effect.

Gadelkarim was placed under arrest. Officers entered the house and saw Cagle's feet protruding from beneath a blanket on the floor in front of a chair. Cagle had been shot, apparently from behind, and was dead. The pathologist concluded that Cagle died of hemorrhage and heart failure.

After being arrested and advised of his rights, Gadelkarim made a number of unsolicited statements indicating he had killed Cagle. At the scene of the crime, Gadelkarim told one officer, "Yes, I shot her, but I did you a favor." Another officer who was taking Gadelkarim to the patrol car overheard Gadelkarim say, "I did it." At one point, Gadelkarim stated he did it because he was innocent and it was Cagle's fault. Gadelkarim stated he was guilty of shooting Cagle but not guilty of taking indecent liberties with A.

At the police station, Gadelkarim made additional incriminating statements despite an officer's suggestion that he not talk. Gad-

elkarim twice stated he shot Cagle. Gadelkarim stated that he shot Cagle, that he was insane, and that he did not know what he was doing. Gadelkarim also stated, "[L]ast night she made me crazy. . . . I tried to get the bitch clean for seven months. . . . [L]ook at me, nice and easy I shoot the bitch."

Officers testified that they believed Gadelkarim was under the influence of alcohol because of the way he walked, his slurred speech, bloodshot eyes, and because of the odor of alcohol. Approximately three and one-half hours after officers first arrived at the scene in Clearwater, Gadelkarim's blood alcohol concentration measured .169.

Gadelkarim was charged with and convicted of first-degree murder and unlawful possession of a firearm. See *State v. Gadelkarim*, 247 Kan. 505, 802 P.2d 507 (1990). On appeal, Gadelkarim claimed the trial court erred in failing to instruct on the defense of voluntary intoxication and the lesser included offense of voluntary manslaughter. 247 Kan. at 507, 509-10. This court affirmed the trial court's refusal to instruct on voluntary manslaughter but reversed the trial court for failing to instruct on voluntary intoxication and remanded for a new trial. 247 Kan. at 509-11.

Prior to Gadelkarim's second trial, defense counsel filed a motion in limine requesting that evidence of Gadelkarim's prior conviction for indecent liberties with a child not be admitted into evidence. The trial court ruled that the State would be able to introduce evidence that Gadelkarim had previously been convicted of an offense but would not be able to specify the nature of the offense. Gadelkarim's second trial ended in a mistrial after a State's witness mentioned the indecent liberties conviction in her testimony.

Prior to his third trial, Gadelkarim filed a motion in limine to exclude evidence of his conviction of indecent liberties with a child. The trial court ruled that "no evidence whatsoever shall be admitted arising from the indecent liberties case." The State took an interlocutory appeal. In an unpublished opinion, No. 66,966 filed August 4, 1992, the Court of Appeals noted that Gadelkarim's threat to kill Cagle if his conviction for indecent liberties was

revealed was strong evidence of premeditation, an essential element of the charge against Gadelkarim. The court held that it was error to exclude Gadelkarim's conviction of indecent liberties with a child. It reversed the trial court and remanded for further proceedings. This court denied a petition for review.

In January 1993, Gadelkarim's third trial commenced. Gadelkarim denied threatening to kill anyone and stated that he could not remember what had happened after he left Roger's Place.

Gadelkarim was found guilty of first-degree premeditated murder and sentenced to a term of life imprisonment, to be served consecutive to his other sentences. Gadelkarim now appeals his convictions.

## I. Judicial Misconduct

Gadelkarim alleges that Judge Robert D. Watson committed judicial misconduct by various comments and interjections Judge Watson made in the presence of the jury. The law in Kansas applicable to alleged incidents of judicial misconduct is well settled.

The trial judge is not merely a moderator, but is the governor of the trial. The judge must strive to have the trial conducted in an atmosphere of impartiality and should refrain from remarks or conduct that may injure a litigant. The judge should be the exemplar of dignity and impartiality, should exercise restraint over judicial conduct and utterances, should suppress personal predilections, and should control his or her temper and emotions. The judge should not permit any person in the courtroom to embroil him or her in conflict and should otherwise avoid conduct which tends to demean the proceedings or to undermine the judge's authority in the courtroom. When it becomes necessary during the trial to comment upon the conduct of witnesses, spectators, counsel, or others, or upon the testimony, the judge should do so in a firm, dignified, and restrained manner, avoiding repartee, limiting comments and rulings to what is reasonably required for the orderly progress of the trial, and refraining from unnecessary disparagement of persons or issues. *State v. Hamilton*, 240 Kan. 539, Syl. ¶¶ 3, 4, 731 P.2d 863 (1987).

Allegations of judicial misconduct during trial must be decided on the particular facts and circumstances surrounding such alleged misconduct. In order to warrant or require the granting of a new trial, it must affirmatively appear that the conduct was of such a nature that it prejudiced the substantial rights of the complaining party. A mere possibility of prejudice from a remark of the judge is not sufficient to overturn a verdict or judgment. If a proper and reasonable construction will render the remark unobjectionable, the remark is not prejudicial. *State v. Nguyen*, 251 Kan. 69, Syl. ¶¶ 4, 5, 833 P.2d 937 (1992).

This court has often had the opportunity to discuss similar complaints about the conduct of Judge Watson. See *State v. Lewis*, 252 Kan. 535, 539, 847 P.2d 690 (1993); *State v. Nguyen*, 251 Kan. at 78-80; *State v. Chism*, 243 Kan. 484, 494, 759 P.2d 105 (1988); *State v. Anderson*, 243 Kan. 677, 677-78, 763 P.2d 597 (1988); *State v. Hamilton*, 240 Kan. 539, 541-47, 731 P.2d 863 (1987); *State v. Starbuck*, 239 Kan. 132, 133-35, 715 P.2d 1291 (1986); *State v. Lake*, 12 Kan. App. 2d 275, 740 P.2d 106, *rev. denied* 242 Kan. 905 (1987). *Hamilton* is the sole case in which this court has found Judge Watson's remarks denied a defendant the constitutional right to a fair trial.

Gadelkarim argues that two instances of objectionable and prejudicial comments from Judge Watson occurred during the orientation of potential jurors. Judge Watson, speaking to the potential jurors, explained the proceedings were starting late because of the heavy criminal caseload. The judge told the jury not to blame defense counsel for the method of selecting the jury because of its request that 36 prospective jurors be examined for cause. Sometime later, Judge Watson introduced his aide to the potential jurors and explained that in addition to her work in the courtroom she supervised 125 probationers.

Gadelkarim contends that Judge Watson's statement that all 36 potential jurors would have to be examined for cause at defense counsel's request placed the defense at a disadvantage. Gadelkarim further claims Judge Watson's comments about the heavy workload in the criminal department and the number of probationers his aide was responsible for gave the jury the impression

that crime was rampant in the community, played upon the fears of the jurors, and caused the jurors to believe that defendant's conviction was necessary to combat crime.

When considered in context, Judge Watson's statements during the orientation of the potential jurors merely explained why the trial proceedings might start late and served to introduce other court personnel. The trial court cannot be faulted for explaining the mechanics of the trial process to prospective jurors. Gadelkarim provides no support for his assertion that the jury felt it had to convict him because of rampant crime in the community or that the jury held him in contempt or otherwise placed him at a disadvantage for choosing a particular voir dire process. Judge Watson specifically cautioned the jury against such blame. There is no indication that these comments by the judge prejudiced the substantial rights of Gadelkarim. See *State v. Walker*, 252 Kan. 279, 290, 845 P.2d 1 (1993).

Next, Gadelkarim questions the court telling the prospective jurors that he would reveal only the streets where they lived but not the house numbers to alleviate the jurors' apprehension of serving on a criminal case. Judge Watson stated that there had never been any repercussions and added that he wanted to be considerate of the jurors. Gadelkarim contends this comment caused jurors to believe retaliation might occur because they served on a criminal jury, especially where a defendant is charged with first-degree murder. Gadelkarim further asserts that the court's comment suggested to the jury that it had better convict Gadelkarim and see that he remained incarcerated.

Gadelkarim fails to show the court's comment prejudiced his rights or had any effect on the jury. Taken in context, the court's statements were clearly designed to assuage any potential discomfort the prospective jurors may have had with the voir dire process. Gadelkarim provides no basis for the implication that the jurors believed they were more apt to suffer retaliation in a first-degree murder case than in any other case. There is nothing in the record to indicate the court's remark incited the jurors against Gadelkarim or that they were less capable of serving as impartial jurors after having heard the judge's comments. Moreover, each

juror took an oath to try the case on the law and evidence presented at trial, and absent proof otherwise, this court presumes that such oath was honored.

Gadelkarim also objects to the judge's statement to the prospective jurors that the parties had different aims, that the judge acted as a referee, and that counsel for each side had opposite purposes. The judge pointed out that the prosecutor "has an interest in a fair manner" to obtain a verdict of guilty, and that defense counsel's aim was "to cause the jury through their usage of their skills in an appropriate manner" to obtain a verdict of not guilty. Gadelkarim contends that this comment implies that the defense would rely on craftiness and not work in a fair manner. Gadelkarim argues the court's comments gave a quality of integrity to the prosecution to the exclusion of the defense.

Gadelkarim misreads the court's comments. In essence, the court's comments illustrate the distinction between the *goals* of the parties to achieve opposite verdicts and did not characterize the manner each party would use to arrive at the desired verdicts. The court did not suggest that the State would be proceeding with integrity while the defense would not. Gadelkarim fails to show these comments prejudiced his substantial rights. See *State v. Walker*, 252 Kan. at 290.

Gadelkarim next challenges several statements made by the trial court indicating that the complaint was more than an allegation or a serious rumor. The judge repeatedly emphasized that the complaint was a sworn document. Gadelkarim argues this gave the jury the impression that the complaint was evidence against him and defeated the presumption of innocence. Gadelkarim further contends that the court's analogy concerning a turkey carcass "was an unmistakable reference to the amount of evidence necessary for proof beyond a reasonable doubt."

The court's remarks must be considered in context. The judge first informed the jury that the complaint was similar to a "serious rumor" that had been developed from an allegation, and which the district attorney was required to swear to before a judge, but only as to her information and belief. The jury was told it was going to determine whether defendant had, in fact, committed a

crime based on the evidence presented. In another remark, the court stated how insignificant the complaint was and compared it to an outline or skeleton. The jury was told to consider the evidence admitted at trial and the court's instructions and determine whether there was sufficient substance to the complaint to find defendant guilty. Contrary to Gadelkarim's contentions, the trial court did not indicate the complaint was any evidence of guilt or attempt to define the standard of proof beyond a reasonable doubt.

Gadelkarim next complains that the court commented that certain things that occurred at trial were "none of [the jury's] business." Gadelkarim argues this comment implied Gadelkarim was trying to hide something from the jury, thereby prejudicing his defense. A review of the record reveals that the court told the jury that what was in the court file was "none of [the jury's] business" because the jury's decision was to be based on the evidence it heard from the witness stand. The court did not imply Gadelkarim was trying to hide anything from the jury. This claim is without merit.

Gadelkarim next argues that Judge Watson erred when he referred to Gadelkarim's right to an appeal. During the orientation of the prospective jurors, the court stated that the lawyers had the right to challenge his rulings by an appeal based on the trial record.

Gadelkarim also notes that later in the trial the court stated: "Of course, this is a matter that's an appealable matter." Gadelkarim argues that Judge Watson's statements violated *State v. Nguyen*, 251 Kan. 69, and prejudiced him by diminishing the jury's sense of responsibility and the importance of its decision, and gave the impression that the judge believed Gadelkarim was guilty.

Basically the same arguments were made in *State v. Nguyen*. This court stated that a trial court should not mention a defendant's right to appeal. Any such reference invites a defendant to appeal whether or not the remark was prejudicial. 251 Kan. at 80. Here, defendant only alleges the possibility of prejudice. His arguments concerning the possibility of prejudice are weak and

do not convince us the remarks prejudiced his rights. See 251 Kan. at 79. Gadelkarim argues that because Judge Watson presided over the *Nguyen* trial, and because that opinion was filed about eight months prior to Gadelkarim's trial, Judge Watson's references to the right to appeal were willfully made and compromised the jury.

The trial court's reference to Gadelkarim's right to appeal are unfortunate and cannot be sanctioned by this court. Nevertheless, Gadelkarim fails to demonstrate that Judge Watson's remarks were prejudicial to his right to a fair trial. Gadelkarim bears the burden of showing his substantial rights were prejudiced. The mere possibility of prejudice is insufficient. *State v. Walker*, 252 Kan. at 290.

Gadelkarim next contends that a colloquy between Judge Watson and defense counsel during the cross-examination of Raymond Koch, a police officer, caused multiple errors. The court's statements were made while defense counsel was questioning the officer as to his training to detect if someone was driving while under the influence. The trial judge mistakenly stated that the officer had not testified about certain evidence during direct examination. He ordered defense counsel not to ask leading questions not covered on direct examination. Gadelkarim argues that the court did not act with dignity and impartiality in informing defense counsel that the scope of cross-examination was limited to matters covered on direct. Gadelkarim argues the trial judge was mistaken about matters that were covered on direct examination, thereby distorting the actual testimony and reflecting poorly on defense counsel. Further, Gadelkarim argues the court erred in restricting defense counsel's use of leading questions.

The State emphasizes that throughout the trial the court repeatedly told the jury that its remarks were not evidence and that the jury's decision was to be based solely on the evidence presented. At the conclusion of the trial, the court instructed the jury that the evidence, and not the court's remarks, controlled. The State cites *State v. Logan*, 236 Kan. 79, 84, 689 P.2d 778 (1984), for the proposition that a jury is presumed to have followed a court's instruction that the case be decided solely on the evidence presented.

Judge Watson was mistaken as to whether Koch had testified about Gadelkarim's "blue wrinkled slacks" on direct examination. Although Judge Watson stated that he recalled hearing testimony about "a bloodstain on some pants," Koch had actually described Gadelkarim's pants as having "a dark spot on them on the upper right leg which to [him] looked like a reddish color." Gadelkarim admits that evidence was later introduced that blood was found on Gadelkarim's pants. Gadelkarim fails to show any substantial prejudice as a result of the court's statements.

As to Judge Watson's comments about the use of leading questions on cross-examination, it is a well-known principle of law that matters discussed on cross-examination must have been explored on direct. "Questions asked on cross-examination must be responsive to testimony given on direct examination, or material or relevant thereto. Resolution of such issues rests within the sound discretion of the district court and will not be reversed unless that discretion is abused." *State v. Nirschl*, 208 Kan. 111, Syl. ¶ 5, 490 P.2d 917 (1971). The court specifically directed defense counsel not to ask leading questions that were not covered by the scope of the direct examination. The court's statements were not an attempt to stop defense counsel's use of leading questions on cross-examination, but an effort to insure that the trial was conducted in accordance with well-established rules of trial practice.

Gadelkarim improperly relies on *Delaware v. Van Arsdall*, 475 U.S. 673, 89 L. Ed. 2d 674, 106 S. Ct. 1431 (1986), for the contention that the district court's limitation of cross-examination constituted a violation of his Sixth Amendment right to confront his accusers. In *Van Arsdall*, the defendant was convicted of murder. The Supreme Court of Delaware noted that the trial court, by improperly restricting defense counsel's cross-examination designed to show bias on the part of a prosecution witness, had violated the defendant's confrontation rights under the Sixth and Fourteenth Amendments to the United States Constitution and that such violation required automatic reversal. The United States Supreme Court held that while the trial court's ruling was contrary to the mandate of the Confrontation Clause of the Sixth Amendment, the Supreme Court of Delaware was wrong when

it declined to consider whether the restriction on cross-examination was harmless in the context of the trial as a whole. 475 U.S. at 684.

Gadelkarim does not assert that the court's statements prevented defense counsel from impeaching the witness or that the defense was prevented from questioning the witness about Gadelkarim's appearance. Even if *Van Arsdall* were applicable, the United States Supreme Court explicitly held that the improper denial of an accused's opportunity to impeach a witness for bias is not grounds for automatic reversal of a conviction but is subject to harmless error analysis. Under such analysis, the correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. In this case, it is difficult to conceive of any damaging potential since the court did not unduly restrict the cross-examination. If the trial court had erred in restricting the scope of the cross-examination, that error was harmless beyond a reasonable doubt.

Gadelkarim's final complaint concerns Judge Watson's directive during Gadelkarim's cross-examination that he was to answer the prosecutor's questions directly without providing gratuitous information. The court stated that if Gadelkarim chose not to follow the court's instructions, it would place Gadelkarim in a holding cell. Gadelkarim contends that he was unduly prejudiced by the court's characterization of his testimony as "rambling" and its threat to confine Gadelkarim should he choose not to comply with the court's directive. Gadelkarim asserts that the court's comments prejudicially limited his right to present a full and complete defense. Gadelkarim cites *Rock v. Arkansas*, 483 U.S. 44, 55, 97 L. Ed. 2d 37, 107 S. Ct. 2704 (1987), for the proposition that a State may not apply an arbitrary rule of competence to exclude a material defense witness from taking the stand or apply a rule of evidence that permits a witness to take the stand but arbitrarily excludes material portions of his or her testimony.

*Rock v. Arkansas* is not applicable to this case. In *Rock*, the issue was whether Arkansas' evidentiary rule prohibiting the admission of hypnotically refreshed testimony violated the defen-

dant's constitutional right to testify on her own behalf in a criminal case. 483 U.S. at 45. Even if *Rock* were applicable, Gadelkarim fails to establish that any material portion of his testimony was excluded. Moreover, the court's statements were directed at Gadelkarim's answers to questions posed on *cross-examination*. Had any material portion of his testimony been excluded during this portion of his trial, defense counsel could have addressed that issue during redirect. Gadelkarim's complaint is without merit.

II. Right to Remain Silent.

During cross-examination of a sheriff's officer, defense counsel asked if the officer had determined that Gadelkarim could not be interviewed after his arrest. The officer responded: "Eventually he invoked Miranda. He wanted to speak with his attorney prior to answering any questions." At a hearing conducted outside the presence of the jury, defense counsel requested the court to grant a mistrial because the officer had improperly informed the jury that Gadelkarim had invoked his right to remain silent. Defense counsel argued that he could not have anticipated the officer's answer because the officer's report indicated that Gadelkarim could not be interviewed because he appeared to be trying to get some sleep.

The prosecution pointed out that the officer's report, in a paragraph immediately subsequent to the one referred to by defense counsel, stated: "Prior to reading *Miranda* rights to the suspect he advised us that he wanted his lawyer prior to making any statements." Defense counsel admitted possessing and having read a copy of the officer's report. The prosecution further asserted that in an earlier proceeding there was testimony that the defendant had invoked his right to remain silent. The prosecution argued that defense counsel was aware that his questions to the witness could elicit the officer's response. Defense counsel responded that the court's prior rulings forced him to ask increasingly less specific questions. Defense counsel's motion for a mistrial was denied. Gadelkarim argues on appeal that admission of the evidence in question deprived him of his due process rights under the Fourteenth Amendment to the United States Constitution.

It is well established that it is constitutionally impermissible for the State to elicit evidence at trial of an accused's silence at the time of arrest and after the accused has received the *Miranda* warnings. *State v. Fisher,* 222 Kan. 76, Syl. ¶ 6, 563 P.2d 1012 (1977). See *Doyle v. Ohio,* 426 U.S. 610, 619, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976) (the use for impeachment purposes of a defendant's silence at the time of arrest and after receiving *Miranda* warnings violated the Due Process Clause of the Fourteenth Amendment).

Gadelkarim relies on *State v. Higgins,* 243 Kan. 48, 755 P.2d 12 (1988). In *Higgins,* at issue was whether the State's attorney impermissibly commented upon the defendant's failure to protest his innocence after he was arrested. While the subject of the defendant's silence initially arose during the defense cross-examination of a witness for the State, this court attached importance to the State's further questioning the witness in detail about the defendant's refusal to talk after his arrest and the State's emphasis on the defendant's silence again during closing argument. 243 Kan. at 51.

Claims that there has been an impermissible comment or question about a defendant's post-*Miranda* silence are measured by the harmless error standard. Only error which fails to meet the federal standard of harmless error, defined as belief beyond a reasonable doubt that the error did not contribute to the verdict, requires reversal. To facilitate the determination of whether a prosecutor's comments are harmless error, Kansas appellate courts consider the nature and extent of the comment in comparison with the strength of the evidence of the defendant's guilt, and further consider whether the language used was manifestly intended to be, or was of such character that the jury would naturally and necessarily take it to be, a comment on the failure of the defendant to testify. *Higgins,* 243 Kan. at 53.

A litigant may not invite and lead a trial court into error and then complain of the trial court's action on appeal. *State v. Prouse,* 244 Kan. 292, 298-99, 767 P.2d 1308 (1989). However, the invited error rule cannot be used as a pretext for the violation of a defendant's constitutional rights where there is no justification for so doing. *State v. Higgins,* 243 Kan. at 51.

In this case, Gadelkarim admits that the State did not rely upon evidence of post-arrest silence as in *Higgins*. In fact, the prosecution expressly agreed not to address the subject of Gadelkarim's silence on redirect. Thus, *Higgins* is distinguishable and provides no basis for reversing Gadelkarim's conviction.

In this case, the officer's comment concerning Gadelkarim's invoking his *Miranda* rights was harmless error. Gadelkarim's complaint involves a single comment elicited by his own attorney on cross-examination, not by the prosecution. Evidence in the record reveals that defense counsel should have been aware of the potential of eliciting the very response of which the defendant now complains. Moreover, the strength of the evidence indicating Gadelkarim's guilt contravenes the argument that Gadelkarim was denied the right to a fair trial by the officer's statement that Gadelkarim had invoked his *Miranda* rights. The trial court did not err in denying Gadelkarim's motion for a mistrial.

III. Admission of Hearsay Statement.

Defense counsel filed a motion to prohibit the State from introducing evidence of statements made by Cagle prior to her death. The State argued Cagle's statements were part of the res gestae or contemporaneous statements, so their reliability would be inherent in the making of the statements. When the court inquired about when Cagle's statements were made, the prosecutor replied: "There are some statements which I believe occurred near in time to the murder itself and then there were some other times that occurred around the time that there were problems in the defendant and Deborah Cagle's relationship and things of that nature." The court denied Gadelkarim's motion, ruling that Cagle's statements were part of the res gestae.

Christine Moline testified that Cagle had called her during Gadelkarim's indecent liberties trial and told her that Gadelkarim had said that if he had to go to prison he would kill himself and take others down with him. Moline further testified that Cagle told her that Gadelkarim had been drinking a lot and that Cagle was very busy at the restaurant. Cagle also said she had thought about leaving Gadelkarim, but that she still loved him. Patricia

Murphy testified that, at some unspecified time, Cagle had told her that the relationship with Gadelkarim was sometimes good and sometimes not so good. Cagle told Murphy that she had verbal arguments with Gadelkarim. Cagle also told Murphy that she had received a red mark on her face in the heat of an argument. Mary Rumery testified that, at some unspecified time, she had a conversation with Cagle in which Cagle told Rumery that she loved Gadelkarim.

Gadelkarim states on appeal that "[a]pparently, the prosecution believed that Cagle's declarations should be admitted under K.S.A. [1993 Supp.] 60-460(d)(3), dealing with the unavailable declarant." Gadelkarim contends that Cagle's statements were not admissible under K.S.A. 1993 Supp. 60-460(d)(3) since there was no evidence when the statements were made and because some of the statements were made while Gadelkarim's indecent liberties trial was pending.

This court previously has discussed the concept of res gestae as related to the admissibility of certain evidence. A great deal of room must be left to the discretion of the trial court in determining admissibility of evidence as a part of the res gestae.

"Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only when no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *State v. Toney*, 253 Kan. 651, 660, 862 P.2d 350 (1993).

Res gestae evidence is that evidence which does not constitute a portion of crimes charged but has a natural, necessary, or logical connection to the crime. *State v. Peck*, 237 Kan. 756, Syl. ¶ 2, 703 P.2d 781 (1985). A good example is contained in *State v. Redford*, 242 Kan. 658, 666, 750 P.2d 1013 (1988), where evidence of the defendant's drug dealing and his belief that the victim had stolen from him was admitted as part of the res gestae because it was logically connected to the crimes of aggravated kidnapping and sexual assault of the victim. Another example of res gestae evidence is found in *State v. Kee*, 238 Kan. 342, 347, 711 P.2d 746 (1985), where the defendant, some 30 to 60 days

prior to the theft of a 100-barrel oil tank, had removed the oil from the tank. Although Kee had not been charged with the theft of the oil, the removal of the oil facilitated the subsequent theft of the tank and was part of the res gestae. *State v. McClanahan*, 254 Kan. 104, 865 P.2d 1021 (1993).

Res gestae is a broader concept than an exception to the hearsay rule. It actually deals with admissibility of evidence of acts or declarations before, during, or after happenings of the principal event. Those acts done or declarations made before, during, or after the happening of the principal occurrence may be admitted as part of the res gestae where those acts or declarations are so closely connected with the principal occurrence as to form in reality a part of the occurrence. *State v. Sherry*, 233 Kan. 920, 667 P.2d 367 (1983). Res gestae includes those circumstances which are automatic and undesigned incidents of the particular litigated act, which may be separated from the act by lapse of time but are illustrative of such act. It is the whole of the transaction under investigation or being litigated and every part of it. Acts done or declarations made before, during, or after the principal occurrence may be admissible as part of the res gestae to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. *State v. Peterson*, 236 Kan. 821, 829, 696 P.2d 387 (1985).

Gadelkarim does not address whether Cagle's statements were admissible as part of the of the res gestae outside the hearsay exception of 60-460(d)(3). The trial court found that all of Cagle's statements, including those which concerned the problems or lack thereof between Gadelkarim and Cagle, had a "natural, necessary, or logical connection to the crime." The trial court stated:

"I think it would be part of the res gestae. I'm going to allow it. . . . Now, I think that it's recent, related close enough to the res gestae that I'd have to let it—with me thinking that I'm aware that the upper courts have broadened what we used to call in a more limited sense res gestae, so; therefore, I'm going to allow it."

Gadelkarim is correct in noting that Judge Watson did not require the State to establish the specific time when Cagle made each declaration.

Evidence of prior acts between a defendant and a victim are admissible independent of K.S.A. 60-455 if the evidence is to establish the relationship between the parties or the existence of a continuing course of conduct between the parties. The trial court did not abuse its discretion by denying Gadelkarim's motion in limine to prohibit testimony regarding statements made by Cagle prior to her death.

Gadelkarim also contends that admission of Cagle's statements violated his constitutional right to confront and cross-examine the witnesses against him. In *State v. Bratt*, 250 Kan. 264, 824 P.2d 983 (1992), we reviewed the rules for determining when incriminating statements admissible under the hearsay rule met the requirements of the Confrontation Clause of the United States Constitution. We noted the following statement from *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 107 S. Ct. 2531 (1980):

"[T]he Confrontation Clause operates in two ways when determining the admissibility of hearsay statements. First, the Sixth Amendment establishes a rule of necessity. In the usual case, the prosecution must either produce or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant. Second, once a witness is shown to be unavailable, the witness' statement is admissible only if it bears adequate indicia of reliability. 448 U.S. at 65. Reliability can be inferred where the evidence falls within a firmly rooted hearsay exception." 250 Kan. at 270; see *State v. Toney*, 253 Kan. at 659.

IV. Admission of Prior Conviction.

Prior to trial, defense counsel filed a motion in limine seeking to prohibit the State from introducing evidence of Gadelkarim's prior conviction for indecent liberties with a child. Defense counsel argued that the probative value of such evidence was substantially outweighed by its unduly prejudicial impact. Defense counsel made suggestions to the trial court that: (1) the conviction, nature of the charge, and all testimony about the case be withheld from the jury; (2) the fact that Gadelkarim had been convicted of the charge be withheld from the jury; (3) the nature of the charge be withheld from the jury; or (4) the specifics of the indecent liberties case not be discussed.

In response, the State noted that at the beginning of Gadelkarim's third trial, a different district court judge had ruled that

the State could not put on any evidence concerning or mention the prior conviction. The State took an interlocutory appeal from that decision. In an unpublished opinion, the Court of Appeals found that suppression of the prior conviction evidence would substantially impair the State's ability to prosecute the case and held that evidence of Gadelkarim's prior conviction constituted part of the res gestae of the instant offense. This court denied Gadelkarim's petition for review. 251 Kan. 940.

On appeal, Gadelkarim argues that because of the nature of the crime involved, evidence of his prior conviction would have an unduly prejudicial effect on his case and deny him a fair trial. According to Gadelkarim, the "emotions of the jurors, hearing that [he] had a previous conviction for indecent liberties with a child, would be incited to a greater·extent than had the prior conviction been for a property offense or crime against the public peace or governmental function." Gadelkarim argues the trial court could have limited the evidence to the fact of a conviction and prohibited evidence of the specific nature of the conviction.

This court's scope of review is limited to determining whether the trial court abused its discretion in admitting the questioned evidence. Evidence of an independent offense is admissible in a criminal action if it is relevant as to the res gestae of the crime. As discussed previously, res gestae evidence is that evidence which does not constitute a portion of the crimes charged but has a natural, necessary, or logical connection to the crime. *State v. Peck*, 237 Kan. 756, Syl. ¶¶ 1, 2.

In this case, Gadelkarim told Cagle's son, A., that he would kill Cagle if A. told anyone about the sexual abuse. Nevertheless, A. told his aunt and the police. Gadelkarim was charged with and convicted of indecent liberties. A few days after his conviction, Gadelkarim killed Cagle. Evidence of the charge and conviction was logically related to the commission of the crime. It provided a motive for the killing and was evidence that Gadelkarim had planned the crime. The mere fact that Gadelkarim's prior crime happened to be indecent liberties with a child did not render that evidence inadmissible or require the trial court to withhold the nature of the crime from the jury.

V. Peremptory Strike.

Gadelkarim argues on appeal that the trial court abused its discretion and violated his constitutional rights in finding the State had legitimately exercised a peremptory challenge to remove Stuart Jamison, a single, black male, from the panel of prospective jurors.

Here, 36 prospective jurors were examined and passed for cause. Of those 36, 3 were members of a racial minority. The State exercised 2 of its 12 peremptory challenges to strike Jamison and one other minority. When defense counsel challenged the State's removal of Jamison, the State explained that the reason for striking Jamison was because he was single and the State preferred married individuals and those from a more stable background. The State also noted that during the voir dire examination Jamison appeared to be napping or tired and was not giving the case the attention it deserved.

Gadelkarim argues that the State's explanation for striking Jamison was not sufficient given the strength of his prima facie showing of racial discrimination, the "racial overtones" of the case, and the disproportionate effect that striking unmarried venirepersons had on the minority members of the venire. Gadelkarim asserts that the trial court found he had made a prima facie showing as required under *Batson v. Kentucky,* 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), because the court asked the prosecutor to explain his reasons for striking Jamison.

In *Batson v. Kentucky,* the United States Supreme Court held that the Equal Protection Clause of the United States Constitution forbids a prosecutor from peremptorily removing prospective jurors solely on the basis of their race. See *State v. Walker,* 252 Kan. 117, 123, 843 P.2d 203 (1992). Gadelkarim cites no authority for his argument that, given his strong prima facie showing of racial discrimination, the State's explanation for striking Jamison must be proportionately strong to pass muster under *Batson.* Relevant case law indicates that the strength of the prima facie showing is now irrelevant. In any event, once the prosecutor has offered a race-neutral explanation for the peremptory chal-

lenge and the court has ruled on the question of intentional discrimination, the issue of whether the defendant has made a prima facie showing becomes moot. *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 111 S. Ct. 1859 (1991).

Gadelkarim's assertion that his case had "many racial overtones" appears to be a reference to the fact that he is Egyptian and Cagle was white. Gadelkarim offers no proof that these factors influenced the fairness of his trial or the venire. This leaves Gadelkarim's remaining argument that striking unmarried venirepersons had a disproportionate effect on the minority members of the venire. Gadelkarim apparently seizes upon language from *Batson* that circumstantial evidence of invidious intent may include proof of disproportionate impact.

Once a trial court has determined the State removed a prospective juror for race-neutral reasons, appellate court review is limited to determining whether the trial court abused its discretion. *State v. Walston*, 256 Kan. 396, 885 P.2d 1226 (1994); *State v. Sledd*, 250 Kan. 15, Syl. ¶ 2, 825 P.2d 114, *cert. denied* ___ U.S. ___, 121 L. Ed. 2d 98 (1992).

The United States Supreme Court discussed disparate impact claims under *Batson* in *Hernandez v. New York*, 500 U.S. 352. It stated:

"[I]n evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law. A court addressing this issue must keep in mind the fundamental principle that 'official action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.' *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264-65 (1977)." 500 U.S. at 359-60.

Gadelkarim fails to substantiate his assertion that the State's removal of Jamison was proof of discriminatory intent. Consistent with its ideal profile of petit jurors, the State removed all of the nonminority prospective jurors that were single or divorced. In addition, a married, black female served on the jury. " 'Although the mere presence of members of a certain race on the final jury does not automatically negate a *Batson* violation, [citation omit-

ted] it can be a relevant factor, particularly when the prosecution had the opportunity to strike them.'" *State v. Kingsley*, 252 Kan. 761, 778, 851 P.2d 370 (1993) (quoting *United States v. Esparen*, 930 F.2d 1461, 1468 [10th Cir. 1991]).

Gadelkarim argues this court should not consider Jamison's alleged inattentiveness in determining whether the trial court abused its discretion, since the trial court made no finding of fact concerning whether Jamison was in fact inattentive. Gadelkarim argues that "[b]ecause the district court in the instant case did not make any findings about the alleged behavior of Mr. Jamison during voir dire, there is no way to determine if this explanation is race-neutral." Gadelkarim does not cite any Kansas authority for the proposition that factual findings are required. The State, on the other hand, asserts that this was not the reason given for striking Jamison. Rather, the State argues that it struck Jamison because he was single.

The whole idea of giving deference to the trial court in making a determination of whether purposeful discrimination exists runs contrary to requiring the trial court to make factual findings each and every time. Nevertheless, it is not clear whether the trial court allowed the prosecution to remove Jamison for his inattentiveness or because he was single. However, Gadelkarim fails to refute the fact that either reason would justify the State's exercise of its peremptory challenge against him.

VI. Lesser Included Offense.

Gadelkarim contends the trial court erred in refusing to instruct on voluntary manslaughter because there was evidence that the killing may have taken place upon a sudden quarrel or in the heat of passion. See K.S.A. 21-3403. In support of his contention, Gadelkarim points to (1) evidence that Gadelkarim told a law enforcement officer that Gadelkarim was insane and did not know what he was doing, and that Cagle had made him crazy; (2) evidence that Gadelkarim verbally and physically abused Cagle; (3) evidence that their relationship was not so good if Cagle "stood up to" Gadelkarim; and (4) evidence that Gadelkarim and Cagle quarrelled as they left the bar in the early morning hours of December 3, 1988.

A trial court has the affirmative duty to instruct the jury on all lesser included offenses established by the evidence. Instructions on lesser included offenses must be given even though the evidence is weak and inconclusive and consists solely of the testimony of the defendant. An instruction on a lesser included offense is applicable only when the evidence is such that the defendant might reasonably have been convicted of the lesser offense. When the trial court refuses to give an instruction on a lesser included offense, the appellate court must view the evidence supporting the lesser charge in the light most favorable to the party requesting the instruction. *State v. Dixon*, 248 Kan. 776, Syl. ¶¶ 1, 2, 811 P.2d 1153 (1991).

There is no evidence in the record of a severe provocation, nor any evidence that immediately prior to her death Cagle had committed aggressive acts, made physical threats, or physically assaulted Gadelkarim while using abusive and insulting language. See *Hobbs*, 248 Kan. 342, 346-47, 807 P.2d 120 (1991). Gadelkarim does not argue that he killed Cagle as a result of the heat of passion or a sudden quarrel, but merely that it was after the incident at the bar. The mere fact that Gadelkarim and Cagle quarrelled sometime before she died is insufficient to require the trial court to instruct on the lesser included offense of manslaughter. Gadelkarim fails to point to any evidence that his emotional state of mind at the time of the act constituted sufficient provocation to cause him to act out of passion rather than reason. The mere statement that the victim made Gadelkarim "crazy" is not evidence of provocation leading to heat of passion or sudden quarrel. Gadelkarim has failed to produce evidence of provocation that would require an instruction on the lesser included offense of voluntary manslaughter.

Affirmed.

HOLMES, C.J., and ALLEGRUCCI, J., concur in the result.