No. 67,275

STATE OF KANSAS, *Appellee,* v. BOBBY L. YOUNG, a/k/a
BOBBY L. YUNG, *Appellant.*

(852 P.2d 510)

Opinion
filed May 28, 1993.

*Reid T. Nelson,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*Rodney H. Symmonds,* county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a direct appeal by Bobby Young from his conviction by a jury of first-degree murder (K.S.A. 1992 Supp. 21-3401). He was convicted for the shooting death of his girlfriend, Carol Dorsey.

Carol Dorsey died on April 4, 1991, from a gunshot wound to her left temple. She lived with Young and Walter "Teddy" Banks. Young testified that the three of them drank "seven days a week from sunup to sundown."

At his trial, Young testified that he had shot Dorsey and that it had been an accident. He gave the following account of events to the jury: Dorsey was lying on the couch watching television and he was walking between the couch and the coffee table when he heard someone knocking on the window behind the couch. There was no response to Young's inquiry as to who was there. When he leaned across Dorsey in order to pull back the curtain, he had a gun in his hand. He then slipped off the couch and heard a shot. When he looked at Dorsey, she had blood on her head.

Banks testified that he had been in the bathroom at the time Dorsey was shot. Because there was no phone in the house where Young, Dorsey, and Banks lived, Banks went to a neighbor's house and asked that the neighbor call 911.

Young went to the house of another neighbor, Paul Mann. Young, with the gun in his hand, told Mann that he had just shot his wife and needed to call 911. While Young was talking with the 911 dispatcher, he put the gun on the table. Mann took it into another room. Mann overheard Young telling the dispatcher that he had accidentally shot his wife.

Mann testified that, after his neighbors had been taken into custody, a detective retrieved the gun from his house. At trial the detective referred to the gun as a pistol and the shells from it as .22 caliber. When he seized it, the pistol had five live rounds and one spent round in the cylinder in the firing position.

Officer Cronk was dispatched to Young's house at about 8:10 p.m. He talked to Young at the house. He testified that Young appeared to be under the influence of alcohol. (Young's blood alcohol concentration later was found to be .25.) He also testified that there were instances when Young's attention seemed to waver from the person who was speaking to him and that Young made some seemingly random statements. When Officer Cronk was able to get Young to pay attention to him, Young coherently answered questions.

Young told Cronk that he did not own a handgun. He denied shooting Dorsey. He blamed the shooting on someone else. He said that there was a fourth person in the house, someone from out of town whose name he did not know, and that the out-of-town person had shot Dorsey.

Young was taken to the police department, where he was interviewed by Detective Davis beginning at approximately 8:53 p.m. on April 4. Davis could smell alcohol on Young, but Davis said that Young was coherent and capable of understanding and responding to questions. Davis described Young as "functioning" and neither stumbling nor falling.

Young told Davis that he had been out in the back yard feeding the dog when he heard a shot. Banks was in the house when Young came back in, and Dorsey was lying on the couch bleeding. Young said he knew the face but not the name of the man who

had shot her. He said that he had gone next door and instructed his neighbor to "call the police because someone shot my woman." Young told Davis that he then went back home and had a conversation with Dorsey. She said to Young that he knew who shot her, and she assured Young that Young was not the person who shot her. Young told Davis that he owned two shotguns, but denied that he owned any other guns or that there were any other guns at the residence. Young stated that, if he had shot Dorsey, "it would have been with a shotgun."

In a second interview conducted by Detective Davis at approximately 9:30 p.m. on April 4, Young repeated his claim that a fourth person had been at the house and had shot Dorsey. Detective Davis confronted Young with the dispatcher's statement that Young had called 911 and reported that he accidentally shot Dorsey. Davis told Young that if the shooting had been an accident, Young should tell him. Young replied, "If I shot her, I'd tell you."

At trial, Young admitted to the jurors that he had hit Dorsey on several occasions and that he had told Robert Freeman that he was going to kill Dorsey. Young also admitted that he had told Connie Mason that he removed the guns from his house because he was afraid he was going to hurt someone.

A number of witnesses testified that they had observed Young physically abuse Dorsey or that they had heard Young talk about physically abusing Dorsey or getting rid of Dorsey or killing Dorsey. Some witnesses saw and heard Young threaten Dorsey, some heard Young accuse Dorsey of infidelity, and one witness testified that he had been threatened by Young. In brief, those witnesses stated the following: Barbara Williams, Dorsey's niece, saw Young hit Dorsey two or three times in the head. Gloria Jacobs heard Young say that, as an embalmer, he knew how to kill a person instantly and then saw Young point to a person's temple. She saw Young slap Dorsey and kick her when she fell to the floor, and she saw Young point a gun at Dorsey and threaten to kill her.

Connie Mason testified that she had heard Young say he suspected Dorsey of infidelity. Benfadean Craig testified that she had heard Young say that he was going to kill Dorsey and Banks and that Young thought they were "fooling around." Martha Bax-

ter, a neighbor, testified that approximately a week before the shooting Young told her that he was going to get rid of Dorsey so that he could be with Baxter. Patrick Coen, another neighbor, testified that, while he was driving Young to the liquor store, Young explained that he was taking his pistol there to get rid of it because he was concerned about hurting Dorsey or Banks or himself. Young told Coen that he had thought about shooting Banks and Dorsey and putting them in the well in the back yard. Sandra Freeman, another neighbor, testified that she heard Young say he was going to shoot Dorsey. Patricia Hardin testified that in March 1991 she heard Young threaten to kill Dorsey and some people who had helped her. Freddie Harrell, a friend of Young, testified that Young told him that, if he could get away with it, he would kill Dorsey.

The defendant first contends that there was not sufficient evidence from which the jury could have found beyond a reasonable doubt that Young was capable of forming the intent to kill Dorsey. In *State v. Bailey*, 251 Kan. 156, Syl. ¶ 2, 834 P.2d 342 (1992), the standard of review was stated as follows:

"When the sufficiency of the evidence is challenged, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt."

Young asserted voluntary intoxication as a defense. K.S.A. 21-3208(2) provides:

"An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind."

In *State v. Beebe*, 244 Kan. 48, 60-61, 766 P.2d 158 (1988), this court concluded that PIK Crim. 2d 54.12 is an adequate statement of the statutory provision on voluntary intoxication. The instruction which the court approved stated:

" 'Voluntary intoxication is not a defense to a criminal charge, but when a particular intent or other state of mind is a necessary element of the offense charged, intoxication may be taken into consideration in determining

whether the accused was capable of forming the necessary intent or state of mind.' "

In the present case the jury was instructed, in accordance with PIK Crim. 2d 54.12-A (1992 Supp.), as follows:

"Voluntary intoxication may be a defense to the charge of murder in the first degree or the lesser included offenses of murder in the second degree, or voluntary manslaughter, where the evidence indicates that such intoxication impaired a defendant's mental faculties to the extent that he was incapable of forming the necessary intent to commit murder in the first degree, murder in the second degree or voluntary manslaughter."

Young contends that the evidence was not sufficient to permit the jury to find that he was capable of forming the necessary intent to kill. He emphasizes evidence of his history of alcoholism, of his blood alcohol level on the night of the shooting, and of his drunken actions on that night. He argues that the State's evidence of his intent to kill consisted of showing the shot was fired at close range and of his statements that he wanted to kill Dorsey. He argues that the finding the shot was fired at close range is consistent and compatible with his version of the shooting. He argues that his statements about killing Dorsey "could not be taken seriously" because it was his customary practice to say things he did not mean, make threats he did not intend to carry out, and fabricate incredible accounts of his activities. Thus, Young concludes that his statements were "only weak circumstantial evidence of his intent to kill [Dorsey]."

The State cites a number of elements of the evidence which would support a finding that Young was capable of forming and had the specific intent to kill Dorsey. Among them are the following: Immediately after the shooting, Young responded to officers' questions in a coherent manner. He appeared to be capable of understanding and responding to questions. In order to protect himself from police action, he told the 911 dispatcher that he was unarmed. He told three widely varying versions of what happened, and all three of them were exculpating.

Before the shooting, Young stated on a number of occasions and to a number of people that he wanted to get rid of Dorsey or that he would kill her. Young had told people that he knew an injury to the temple would kill a person instantly. Approximately a week before the shooting, he took the handgun out of

his house and put it into someone else's possession because he had been thinking about shooting Dorsey. A few days prior to the shooting, Young retrieved the handgun. On the day before the shooting, Young told a friend that he would kill Dorsey if he could get away with it.

The evidence, viewed in the light most favorable to the prosecution, would support the finding of a rational factfinder that Young was capable of forming the intent to kill Dorsey and was guilty beyond a reasonable doubt.

The defendant next contends it was error for the district court to admit evidence that Young had on other occasions physically abused Dorsey. Young complains of specific portions of the testimony of witnesses Patricia Hardin and Dorothy Mae Brooks. Hardin's testimony is as follows:

"Q. And did Carol [Dorsey] at that time visit with you about any concerns that she had about the defendant?

"A. She was afraid of him. She was afraid to leave him. We had discussed her moving out away from the people that she was living with and I had discussed with her that I would try and help her find another place to live if she needed and she said that she was afraid, she was afraid to leave because he would just come there where she was.

"Q. Did she say why she was afraid of him?

"A. Because he hit her, he hit her and kicked her, slapped her, you know, whatever; he just, you know, constantly abused her.

"[Prosecutor]: I don't have any further questions."

Counsel for the defendant then proceeded to cross-examine the witness.

Brooks was Dorsey's sister. Her testimony to which Young objects is as follows:

"Q. Do you remember what the two of you visited about at that time?

"A. We talked about other things and then she got into the—well, she took her jacket off and that's when I had seen her bruises. I asked her what happened and all she said is that he did it and then we talked for a while and she told me then, 'Sis, I'm afraid of him and, Sis, I think—I think he's going to kill me.'

"Q. Was—

"A. (Interrupting) 'I'm afraid he's going to kill me.' I'm sorry.

"Q. Was that the only time that you saw any bruises on Carol that you can recall?

"A. I think I seen little ones on her before but I didn't say anything to her about it.

"Q. Did Carol make any type of similar statements to you on other occasions?

"A. She used to say he fussed with her and he, you know, kind of used her and things like that but that's all.

"[Prosecutor]: Thank you, Ma'am. No further questions."

Counsel for the defendant then proceeded to cross-examine the witness.

Young contends that the testimony contained inadmissible hearsay. Young states in his brief that "[t]he defense objected on hearsay grounds and the state argued that they were admissible under K.S.A. 60-460(l) as mental state." There is no record reference for the objection, and the transcript shows no contemporaneous objection.

The district court judge had indicated to the parties that, before getting into certain evidence which was questionable as to admissibility under K.S.A. 60-455, they would discuss whether or not a precautionary instruction should be given to the jury. K.S.A. 60-455 involves evidence of other crimes or civil wrongs. At the time the district court judge was discussing with counsel upcoming witnesses who might testify as to other crimes or civil wrongs, Young's counsel also objected to a portion of the testimony of Officer Jerry Gilbert on the additional ground that it was hearsay. This hearsay objection seems to have been disposed of to everyone's satisfaction upon the prosecutor's assurance that the out-of-court statements which would be related by Officer Gilbert were made by Young.

Pressing the discussion of a precautionary instruction on evidence of other crimes and civil wrongs, the district court judge asked the State to make a proffer of what various witnesses were expected to say. The prosecutor stated that Dorothy Brooks would testify as to statements made to her by Dorsey. The district court judge identified this testimony as containing an "out-of-court statement of Carol Dorsey," and asked the prosecutor to state his "position with regard to the hearsay implications." Then the district court judge asked defense counsel for his "argument as to the hearsay implications." In this way, defense counsel specifically stated his hearsay objection to the testimony of Brooks. The district court overruled the objection based on this court's

rulings in *State v. Taylor*, 234 Kan. 401, 408, 673 P.2d 1140 (1983), and *State v. Wood*, 230 Kan. 477, 638 P.2d 908 (1982).

Among the witnesses whose testimony was included in the State's continuing proffer was Patricia Hardin. The prosecutor stated:

"She would also testify just—not anything pertaining to the defendant as far as bad acts, but it would deal with the fact that Carol was horrified and scared of the defendant, she was afraid to leave the defendant, he had hit her before, that Carol had put him out and the defendant would always just kick in the door, climb back through the window and be right back into her life."

Defense counsel did not object to Hardin's testimony on the ground of hearsay when the prosecutor made the proffer of her testimony, nor does the record show any specific objection to Hardin's testimony on this ground.

On appeal, Young concedes that the witnesses' testimony about Dorsey's fear of him was admissible pursuant to K.S.A. 1992 Supp. 60-460(l), which permits introduction of statements of the declarant's state of mind. K.S.A. 1992 Supp. 60-460(l) states:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter, is hearsay evidence and inadmissible except:

. . . .

"(l) Statements of physical or mental condition of declarant. Unless the judge finds it was made in bad faith, a statement of the declarant's (1) then existing state of mind, emotion or physical sensation, including statements of intent, plan, motive, design, mental feeling, pain and bodily health, but not including memory or belief to prove the fact remembered or believed, when such a mental or physical condition is in issue or is relevant to prove or explain acts or conduct of the declarant or (2) previous symptoms, pain or physical sensation, made to a physician consulted for treatment or for diagnosis with a view to treatment, and relevant to an issue of declarant's bodily condition."

He argues, however, that 60-460(l) does not permit Brooks' testimony that Dorsey said Young "did it" when she was asked about her bruises and Hardin's testimony that Dorsey said she was afraid of Young because he "hit her," "kicked her," "slapped her," and "constantly abused her." He contends that the testimony consists of "statements to prove a fact remembered, and they were therefore inadmissible." Defendant is referring to the exception to the hearsay rule for statements of the mental con-

dition of the declarant, which disallows a statement of "memory or belief to prove the fact remembered or believed."

The State argues that the testimony is not hearsay. The State relies on this court's reasoning from *Taylor*. Mrs. Taylor, the homicide victim and wife of the defendant, kept a notebook in connection with a marriage encounter session which she and her husband had attended. The State offered the notebook into evidence, and defendant objected on the ground of hearsay, among others. 234 Kan. at 407. This court reasoned as follows:

"The statements in the notebook were not inadmissible hearsay because they were not introduced to prove the truth of the matters stated, such as whether the defendant had a bad temper. K.S.A. 60-460. The significance of the statements lies in the fact that they were made. *State v. James*, 223 Kan. 107, 108-09, 574 P.2d 181 (1977). They show Mrs. Taylor believed the marriage had problems, that there was indeed marital discord. *State v. Phipps*, 224 Kan. 158.

"The rule in Kansas is that in a case of marital homicide, evidence of a discordant marital relationship and a wife's fear of her husband's temper is competent as bearing on the defendant's motive and intent. The court did not err in admitting into evidence Shirley Taylor's letters which contained statements of marital discord and her fear of the defendant's temper since they showed the relationship of the parties and their conduct in that relationship." 234 Kan. at 408.

The State contends that, even if the statements were hearsay, they were admissible pursuant to the exception set out in K.S.A. 1992 Supp. 60-460(d)(3), which allows

"[a] statement which the judge finds was made . . . (3) if the declarant is unavailable as a witness, by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort."

K.S.A. 60-459(g)(3) defines "unavailable as a witness" to include "unable to be present or to testify at the hearing because of death."

The State also contends that the testimony of Brooks and Hardin is admissible under K.S.A. 1992 Supp. 60-460(l)(1). It appears that the State's argument in this regard is that Dorsey's statements expressed her then-existing mental state of apprehension of harm at the hands of Young without relying on memory or belief to prove that she was afraid of him.

Brooks testified that Dorsey had told her that Young bruised her. The rationale from *Taylor* applies to this testimony of Brooks. The significance of the statement by Dorsey that Young bruised her lies in its being made. It shows that Dorsey believed the relationship had problems and that there was indeed discord between them. As stated in *Taylor*, the rule in this state is that "in a case of marital homicide, evidence of a discordant marital relationship and a wife's fear of her husband's temper is competent as bearing on the defendant's motive and intent." 234 Kan. at 408. No reason has been presented, nor do we know of any, why the lack of a marital commitment in the live-in relationship of Dorsey and Young should alter the principle expressed in *Taylor*. We conclude the rule and rationale of *Taylor* is applicable to Young and Dorsey's live-in relationship.

Hardin was asked, "Did she say why she was afraid of him?" Hardin did not answer the question which was asked. She responded, "Because he hit her, he hit her and kicked her, slapped her, you know, whatever; he just, you know, constantly abused her." Hardin's answer would support more than one interpretation. The most likely is that Dorsey did say why she was afraid of Young and what Dorsey said was that she was afraid of him because he physically abused her. Another is that Hardin was aware of Young's physically abusing Dorsey, and it was self-evident to Hardin that Dorsey, in the circumstances, would be afraid of Young. It is not clear that Hardin was relating a statement made by Dorsey; hence, there is a question as to whether the testimony involved an out-of-court statement of the declarant. In either case, Hardin's testimony did not constitute inadmissible hearsay; however, the issue has not been preserved for consideration on appeal. We find no error in the admission of Brooks' and Hardin's testimony.

The judgment of the district court is affirmed.