No. 74,991

STATE OF KANSAS, *Appellee,* v. STEVEN A. CLARK, *Appellant.*

931 P.2d 664

Opinion filed January 24, 1997.

*Elizabeth Seale Cateforis*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Charles R. Reimer*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant Steven A. Clark appeals his convictions of murder in the first degree, K.S.A. 21-3401, and attempted murder in the first degree, K.S.A. 21-3301 and K.S.A. 21-3401. Defendant claims the trial court erred by (1) failing to instruct the jury on (a) reckless second-degree murder as a lesser included offense of first-degree murder and (b) attempted second-degree

murder and attempted voluntary manslaughter as lesser included offenses of attempted first-degree murder; (2) admitting (a) evidence of the deceased's statements concerning her relationship with the defendant as res gestae of the crime and (b) evidence of the defendant's statements made after he was taken into custody; (3) instructing the jury on an improper burden of proof; (4) using the phrase "claims made by the State" in instructing the jury regarding the burden of proof; and (5) admitting gruesome photographs. Defendant also contends there was insufficient evidence to convict him of first-degree murder or attempted first-degree murder.

On October 22, 1994, Clark and his girlfriend Lynette Odanga, the deceased, along with their friends Kenneth Shine and April Dotson, went to Acapulco Joe's bar in Wichita to celebrate Lynette's birthday. Lynette and Clark had been dating for several years and were living together in Lynette's apartment. April Dotson, Lynette's best friend, lived in the same apartment complex. Dotson was engaged to Shine. Lynette and Clark's relationship was troubled and the couple fought frequently.

The four friends planned to join a larger group to celebrate Lynette's birthday at the club. Witnesses described two incidents at the club. First, Clark attempted to prevent a man from joining the group's table at the invitation of one of the women. When Lynette attempted to defuse the situation by putting her hand on the man's shoulder, Clark told the man to take his hands off "his woman" and pushed the man.

The second incident involved Kenneth Shine. When Shine told a joke to April Dotson about another woman, Clark accused Shine of being disrespectful to Dotson. Shine walked away. Witnesses testified Clark followed and "got in [Shine's] face." Shine put his hands on Clark's neck and pushed Clark away.

After the club closed at 1:30 or 2 A.M., Clark started to leave in Jeff Peebler's car. Peebler, a friend of Clark's, hoped to calm Clark down. Peebler testified Clark said he had a gun and "could take care of it that way." As Peebler circled back to the parking lot, Clark saw Lynette talking to another man. Clark became angry and told Peebler to stop the car. Clark got out and accused Lynette of

being disrespectful. When Shine told Clark to calm down, Clark accused him of "f'ing" Lynette. Shine told Clark he would knock his head off for saying that. Clark, Lynette, and Dotson got into Shine's car. Shine and Dotson dropped Lynette and Clark off at their apartment.

Later Clark called Dotson's apartment. Dotson could hear Lynette screaming, "[C]ome get me." Dotson told Clark that she, Shine, and Jeff Peebler would come get Lynette and have Lynette spend the night at Dotson's apartment. The group arrived at Lynette's apartment house. Dotson walked upstairs and knocked on the door of Lynette's apartment. Clark opened the door. Dotson heard Lynette screaming "[H]e hit me, he hit me," and observed Lynette holding the side of her face. Clark denied hitting Lynette.

Shine also observed Lynette holding her face and stating that Clark had hit her. Clark denied he had hit Lynette. Shine did not believe Clark. Shine entered the apartment, cursed Clark, and then pushed him. The two men fought. The scuffle ended with Shine on the couch and Clark in his lap. The phone rang, and April Dotson answered it. It was a 911 dispatcher returning an earlier call. Clark hung up the phone.

Clark went into the bedroom. Shine followed in an attempt to work things out. Dotson called 911. When Shine reached the bedroom, he heard metal clicking. Clark then aimed a revolver at Shine and stated, "This is what you get if you mess with me." Shine turned, yelling at everyone to get out because Clark had a gun. Shine, Jeff, and Lynette left the apartment. Dotson remained on the telephone with the police.

Shine observed that Clark was following him. He heard a shot and ducked around the corner of an apartment. He punched Clark as Clark ran by. Clark fell down. Shine told Clark, "[C]ome on, Steve, enough of this." Shine told Lynette to go back to her apartment.

Clark fired a total of two shots in Shine's direction. Before fleeing, Shine tried to convince Lynette to leave. Lynette stated to Shine that she could talk to Clark. Clark then walked over to Lynette, pointed the gun at her, and said, "I told you this would happen." Lynette reached towards Clark and said, "Steve, enough,

enough of this, enough of this." As Clark got closer, Lynette bent down with her hands up toward her face. Clark fired the gun and Lynette fell. The autopsy revealed that Lynette had been shot in the left temple and that the muzzle of the gun was in contact with her skin when the trigger was pulled.

Police arrived in response to the 911 calls. They observed Clark lie down and drape himself over Lynette's body. Incoherent and crying, Clark pointed the gun at his head, said he loved Lynette, and then cursed her because she had been with another man. Clark told the officers, "I killed her, I killed her, just shoot me." Clark stated the killing was an accident. He stated he did not mean to kill Lynette and he had killed the only woman he had loved.

After Clark surrendered the gun, he was taken into custody and transported to the police department. Police testified that while being transported in the van, Clark yelled, "Did I kill the bitch?" over and over. Clark was charged with and convicted by a jury of first-degree murder of Lynette Odanga and attempted first-degree murder of Kenneth Shine.

## I. LESSER INCLUDED OFFENSE INSTRUCTIONS

The defendant in a criminal prosecution has a statutory right to have the court instruct the jury on all lesser included offenses established by substantial evidence. The question is not whether, in the mind of the court, the evidence as a whole excludes the idea that the defendant is guilty of a lesser degree of the offense charged, but whether there is any substantial evidence tending to prove a lesser degree of the offense. If there is, then the question of such degree should be submitted to the jury. The unsupported testimony of the defendant alone, if tending to establish such lesser degree, is sufficient to require the court to so instruct. *State v. Deavers*, 252 Kan. 149, Syl. ¶ 1, 843 P.2d 695 (1992), *cert. denied* 508 U.S. 978 (1993).

In addition to instructing on premeditated murder in the first degree and attempted premeditated murder in the first degree, the trial court instructed the jury on intentional second-degree murder, voluntary manslaughter, and involuntary manslaughter of Lynette Odanga and aggravated assault of Kenneth Shine. Clark

now claims that the trial court erred in failing to instruct the jury on the additional lesser included offenses of reckless second-degree murder of Lynette and attempted second-degree murder and attempted voluntary manslaughter of Shine. Clark did not request the lesser included offense instructions.

A. Reckless Second-Degree Murder Of Lynette

Reckless second-degree murder, or "depraved heart murder" at common law, is defined in K.S.A. 21-3402, which provides in part:

"Murder in the second degree is the killing of a human being committed:

. . .

"(b) unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life."

Reckless conduct is conduct done under circumstances that show a realization of the imminence of danger to the person of another and a conscious and unjustifiable disregard of that danger. The terms "gross negligence," "culpable negligence," "wanton negligence" and "wantonness" are included within the term "recklessness." K.S.A. 21-3201(c). Both the statutory rules and case law support the conclusion that if there is substantial evidence, reckless second-degree murder, or depraved heart murder, is a lesser included crime of first-degree murder. *State v. Pierce*, 260 Kan. 859, 865, 927 P.2d 929 (1996).

Reckless second-degree murder is distinguished from first-degree murder and intentional second-degree murder by the level of intent required. As one commentator has explained:

"Extremely negligent conduct, which creates what a reasonable [person] would realize to be not only an unjustifiable but also a very high degree of risk of death or serious bodily injury to another or to others—though unaccompanied by any intent to kill or do serious bodily injury—and which actually causes the death of another, may constitute [depraved heart] murder." 2 LaFave & Scott, Substantive Criminal Law § 7.4 (1986).

Clark did not testify at trial. In closing, defense counsel argued that the gun accidentally discharged as Lynette moved down just before she was shot. Clark now asserts that the evidence of his intent when he approached Lynette was "inconclusive" and that

the jury could have inferred that the killing was unintentional from his demeanor and statements to police after the shooting.

The only evidence at trial of an accidental shooting was the statement Clark made after arrival of the law enforcement officers that he did not intend to kill Lynette. Clark's self-serving statement alone does not support a finding of recklessness, nor does the other evidence adduced at trial support an instruction on the lesser crime of reckless second-degree murder. In addition to the facts previously stated, there was uncontroverted testimony that the muzzle of the .357 caliber revolver was closely pressed against Lynette's left temple when Clark fired the gun. Clark had fired two shots at Shine. Because the gun was a double action pistol, Clark either cocked the pistol prior to shooting Lynette or cocked and fired the gun by pulling the trigger. The gun required six pounds of pressure on the trigger to fire when the hammer was manually cocked. If the hammer was not manually cocked, the trigger pressure required to discharge the gun was 13 pounds. Shine also testified that Lynette was already bent down to her right before Clark fired the shot. This testimony contradicts Clark's assertion that the gun accidentally contacted Lynette's left temple as she was bending down to her right.

Under these circumstances, when viewed in the light most favorable to the defendant, the evidence would not have justified a jury verdict for reckless second-degree murder. Accordingly, the trial court was under no duty to instruct on this lesser included offense.

B. Attempted Second-Degree Murder and Attempted Voluntary Manslaughter of Shine

Clark first argues that the evidence supported a jury instruction on attempted second-degree murder of Shine. K.S.A. 21-3301(a) defines attempt as "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 21-3402(a) provides that second-degree murder is the malicious killing of a human intentionally without deliberation or premeditation. Second-degree murder is a lesser in-

cluded offense of first-degree murder. *State v. Seelke*, 221 Kan. 672, 675, 561 P.2d 869 (1977). In closing,defense counsel argued that Clark's actions were not premeditated.

The key element of second-degree murder is the lack of premeditation. Here, the uncontroverted evidence showed that Clark was angry at Shine after the incident at Acapulco Joe's and told Jeff Peebles he had a gun and "could take care of things that way." Later, at the apartment, Clark obtained a pistol and stated, "This is what you get if you mess with me," as he pointed the gun at Shine in the bedroom. Clark also chased Shine with the gun, yelling, "[Y]ou are a dead black motherfucker." Based on Clark's actions and these statements, the evidence at trial was not sufficient to support an instruction on attempted second-degree murder.

Clark also argues that the evidence required a jury instruction on the attempted voluntary manslaughter of Shine or the attempted intentional killing of a human being upon a sudden quarrel or in the heat of passion. K.S.A. 21-3403(a). Voluntary manslaughter is a lesser included offense of first-degree murder. *State v. Arteaga*, 257 Kan. 874, 890, 896 P.2d 1035 (1995). In closing, defense counsel argued that Clark's acts were the result of physical provocation by Shine.

The key elements of voluntary manslaughter are whether the killing was intentional and whether there was legally sufficient provocation. *State v. McClanahan*, 254 Kan. 104, 113, 865 P.2d 1021 (1993). Whether a provocation is legally sufficient is an objective, rather than a subjective, determination. To be legally sufficient to intentionally kill an individual, a provocation must consist of more than mere words or gestures, and if assault or battery is involved the defendant must have a reasonable belief that he or she is in danger of great bodily harm or at risk of death. *McClanahan*, 254 Kan. at 114. A provocation is legally sufficient if it is calculated to deprive a reasonable person of self-control and to cause the person to act out of passion rather than reason. *State v. Guebara*, 236 Kan. 791, 796, 696 P.2d 381 (1985).

Here, although there was evidence that Shine physically confronted Clark both in Lynette's apartment and on the apartment grounds, there was no evidence these confrontations were suffi-

cient to cause Clark to believe he was in danger of great bodily harm or to deprive him of self-control. Earlier that evening, Clark had exhibited and expressed an intent to use the gun. The altercation at the apartment ended with Shine and Clark sitting on the couch and letting go of each other. It was after this fracas ended that Shine heard Clark loading the gun. As Shine fled the apartment, Clark followed and fired a shot. After the second confrontation on the apartment grounds, Clark fired another shot. Clark's acts against Shine were deliberate and previously expressed. Under these facts, the court did not err in failing to instruct on attempted second-degree murder and attempted voluntary manslaughter.

## II. ADMISSIBILITY OF EVIDENCE

"Evidence" is the means from which inferences may be drawn as a basis of proof in duly constituted judicial or fact-finding tribunals, and includes testimony in the form of opinion, and hearsay. K.S.A. 60-401(a). All relevant evidence shall be admitted which is admissible. K.S.A. 60-407(f). "Relevant evidence" is evidence having any tendency in reason to prove any material fact. K.S.A. 60-401(b). A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection. K.S.A. 60-404.

Prior to trial, Clark filed a motion in limine to exclude all evidence that Lynette intended to end her relationship with him and to exclude his statement, "Did I kill the bitch?" repeatedly made while he was being transported in the police van. Clark argued that the evidence was irrelevant, hearsay, and unduly prejudicial. As to Lynette's prior statements, the State asserted that evidence of the nature of the relationship between Lynette and Clark was relevant to Clark's motive and intent. The State's theory for admission of that evidence was that Clark killed Lynette because he was angry that she wanted him to move out and was jealous of her contacts with other men. The trial court excluded two other instances of prior abuse which the State sought to introduce, but admitted the

victim's prior statements as part of the res gestae of their relationship and the crime.

An appellate court's review of the trial court's admission of evidence is a two-step process. First, it must determine whether the evidence was admissible or inadmissible. Then, if the evidence was improperly admitted, it must determine whether to apply the harmless error rule of review or the federal constitutional error rule to the erroneous admission of that evidence.

Review of the admission or the exclusion of evidence is usually governed by the harmless error rule. K.S.A. 60-261 provides that no error in either the admission or the exclusion of evidence by the court is a ground for granting a new trial or for setting aside a verdict unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties. *State v. Morris*, 255 Kan. 964, Syl. ¶ 6, 880 P.2d 1244 (1994).

Under the federal constitutional error rule, an error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. Before we may declare the error harmless, we must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *State v. McClanahan*, 259 Kan. 86, Syl. ¶ 4, 910 P.2d 193 (1996).

A. Clark's Discordant Relationship with Lynette

At trial, Lynette's friends testified she wanted to end the relationship and ask Clark to move out. April Dotson testified Lynette told April she still cared for Clark and intended to give him time to find a job before making him leave. Lynette also told April she was afraid Clark would kill himself if she asked him to move out. In ruling on Clark's motion in limine regarding these statements, the trial judge ruled the statements were admissible as part of the res gestae of the crime.

Clark abandoned his hearsay objection on appeal and now contends Lynette's statements were irrelevant and too remote and un-

connected to the issues the State sought to prove. Clark acknowledges that this court has allowed evidence of discord in a marital relationship as bearing upon motive and intent in *State v. Taylor*, 234 Kan. 401, 673 P.2d 1140 (1983), and extended this rule to include persons living together in *State v. Young*, 253 Kan. 28, 852 P.2d 510 (1993). Clark attempts to distinguish these cases on the grounds that here there is no evidence that Lynette feared Clark or that Clark had a history of physically abusing Lynette.

We have addressed the issue of relevance of evidence of a discordant relationship between a defendant and a victim in numerous cases and have held that admission of evidence of a discordant relationship is admissible independent of K.S.A. 60-455 and relevant to show the ongoing relationship between the parties, the existence of a continuing course of conduct, or to corroborate the testimony of witnesses as to the act charged. See *State v. Hedger*, 248 Kan. 815, 820, 811 P.2d 1170 (1991); *State v. Taylor*, 234 Kan. at 407; *State v. Green*, 232 Kan. 116, Syl. ¶ 4, 652 P.2d 697 (1982). In *Hedger*, we also discussed the remoteness of such evidence and held that any lapse of time between the acts described in the trial testimony and the acts alleged does not preclude the admission of evidence relevant to motive and intent, but only goes to the weight to be given the evidence. 248 Kan. at 820 (citing *State v. Green*, 232 Kan. 116, Syl. ¶ 5).

Contrary to Clark's assertion, this court has never required fear or physical abuse as a condition of admissibility of evidence of a discordant relationship as long as the evidence of the nature of the relationship bears upon motive and intent. For example, in *State v. Phipps*, 224 Kan. 158, 578 P.2d 709 (1978), Phipps was convicted of killing his father-in-law. The victim's sister was allowed to testify that the deceased had stated the defendant was running his family life. The *Phipps* court noted that the statements were not hearsay because they were not offered to prove the truth of the statements but were introduced "solely to show the deceased's state of mind before his death and to demonstrate to the jury the rift between defendant and the deceased." 224 Kan. at 160.

Though often confused with the hearsay rules, res gestae is a broader concept than an exception to the hearsay rule. The term

"res gestae," a Latin term meaning "things done," includes circumstances, facts, and declarations incidental to the main fact or transaction. 29A Am. Jur. 2d, Evidence § 860. Those acts done or declarations made before, during, or after the happening of the principal occurrence may be admitted as part of the res gestae where those acts or declarations are so closely connected with the principal occurrence as to form in reality a part of the occurrence. *State v. Gadelkarim,* 256 Kan. 671, 688, 887 P.2d 88 (1994) (citing *State v. Sherry,* 233 Kan. 920, 667 P.2d 367 [1983]). The acts done or declarations made as part of the res gestae are not admitted into evidence without limitation but are governed by the procedural rules and rules of evidence set out in Article 4, chapter 60 of the Kansas Statutes Annotated.

Res gestae includes those circumstances which are automatic and undesigned incidents of the particular litigated act, which may be separated from the act by lapse of time but are illustrative of such act. It is the whole of the transaction under investigation or being litigated and every part of it. Acts done or declarations made before, during, or after the principal occurrence may be admissible as part of the res gestae to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. *State v. Peterson,* 236 Kan. 821, 829, 696 P.2d 387 (1985). An example of admissible res gestae evidence is found in *State v. Redford,* 242 Kan. 658, 750 P.2d 1013 (1988), where evidence of the defendant's drug dealing and his belief that the victim had stolen from him was admitted as part of the res gestae because it was logically connected to the crimes of aggravated kidnapping and sexual assault. 242 Kan. at 666.

Res gestae evidence is also analogous to the admission of K.S.A. 60-455 evidence of other crimes and civil wrongs. Under K.S.A. 60-455, evidence that a person committed a crime or civil wrong on a specified occasion is inadmissible to prove a defendant's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and K.S.A. 60-448, such evidence is admissible when relevant to prove some other

material fact including motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Here, the statements concerning the nature of the parties' relationship are relevant because of their connection to the discordant relationship of Clark and Lynette and not because they are statements illustrative of the crime. The statements were relevant to the State's allegations that prior to shooting Lynette, Clark was angry because Lynette wanted to end the relationship. Under such circumstances, the prior statements concerning the relationship of Clark and Lynette were relevant to motive, intent, and absence of mistake and are admissible.

### B. Statement in Police Van

Except as restricted in Article 4, chapter 60, of the Kansas Statutes Annotated, a judge may in his or her discretion exclude evidence if the judge finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered. K.S.A. 60-445.

Clark argues the trial court erred in admitting testimony from the police van driver that while being transported to the police station, Clark repeatedly yelled out, "Did I kill the bitch?" Clark asserted that admission of these statements was unduly prejudicial and that his referral to Lynette as "bitch" prejudiced the jury. He also asserts that the statements had no logical connection to the overall events and were not relevant to demonstrate his intent at time of shooting because they were made after the shooting. The State argued to the trial judge that Clark's statements were relevant as to his state of mind, motive, and intent and as part of the res gestae of the crime. The State contended that Clark's statement and conduct after the killing were relevant as to whether the shooting of Lynette was an accident or an intentional premeditated murder.

At trial, defense counsel stated in closing argument that the killing was accidental. This defense was based upon Clark's statement that the shooting was accidental, which he made to police right after the shooting and before he was taken into custody. His con-

tradictory statements, "Did I kill the bitch?" were made a few minutes after he was taken into custody and were relevant to illustrate Clark's attitude towards Lynette and to contrast with his earlier actions and statements that he was distraught over an accidental shooting. The trial court did not err in admitting these statements.

## III. INSTRUCTIONS

The law is well settled that upon review of a challenged jury instruction, the instructions are to be considered together and read as a whole without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error, although they may be in some small way erroneous. *State v. Johnson*, 255 Kan. 252, Syl. ¶ 4, 874 P.2d 623 (1994).

Clark first challenges jury instruction No. 4, which stated:

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty until you are convinced from the evidence that he is guilty.

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any claims made by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of any of the claims made by the State, you should find the defendant guilty."

This instruction duplicates PIK Crim. 3d 52.02.

The defendant did not object to the giving of the instruction at trial. No party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds of the objection, unless the instruction is clearly erroneous. K.S.A. 22-3414(3). An instruction is clearly erroneous only if the reviewing court finds beyond a reasonable doubt that if the trial error had not occurred, there is a real possibility the jury would have returned a different verdict. *State v. Deavers*, 252 Kan. 149, 164-65, 843 P.2d 695 (1992), *cert. denied* 508 U.S. 978 (1993).

The defendant argues that the use of the words "not guilty" in the first portion of the instruction, rather than a statement that the defendant is presumed "innocent," is clearly erroneous because it dilutes the presumption of innocence guaranteed by K.S.A. 21-3109. Next, he argues that the phrase "claims made by the State" instead of "elements of the offense" is clearly erroneous because it leads to confusion regarding the burden of proof. He asserts that the latter problem is exacerbated when instruction No. 4 is read together with instructions Nos. 7, 9, 10, 11, 14, and 16, which also referred to "claims" made by the State.

A. "Not guilty" rather than "presumed innocent."

The defendant contends that the failure to include the presumption of innocence and the use of the terms "guilty" and "not guilty" in the instruction do not accurately convey the law and do not fully convey the fundamental constitutional right to the presumption of innocence. The defendant relies on the analysis of *Flores v. State*, 896 P.2d 558, *reh. denied* 899 P.2d 1162 (Okla. Crim. App.), *cert. denied* 133 L. Ed. 2d 450 (1995). We note at the outset that there is no constitutional requirement that the jury be instructed on the presumption of innocence. *Kentucky v. Whorton*, 441 U.S. 786, 788, 60 L. Ed. 2d 640, 99 S. Ct. 2088 (1979); *Taylor v. Kentucky*, 436 U.S. 478, 485, 56 L. Ed. 2d 468, 98 S. Ct. 1930 (1978).

This same issue was recently decided by the court in *State v. Pierce*, 260 Kan. 859, 869, 927 P.2d 929 (1996). We held in *Pierce* that the instruction at issue preserves the defendant's presumption of innocence. We noted that we adopted an opposing view to that in *Flores* in *State v. Keeler*, 238 Kan. 356, 710 P.2d 1279 (1985), where we held that "not guilty" was preferable to "innocent" in an instruction to the jury. In *Keeler*, we found authority persuasive that stated in part:

" 'In ordinary lay usage, the term *not guilty* is often considered to be synonymous with *innocent*. In American criminal jurisprudence, however, they are not totally synonymous. "Not Guilty" is a legal finding by the jury that the prosecution has not met its burden of proof. A "Not Guilty" verdict can result from either of two states of mind on the part of the jury: that they believe the defendant is factually innocent and did not commit the crime; or, although they do not nec-

essarily believe he is innocent, and even "tend" to believe he did commit the crime, the prosecution's case was not sufficiently strong to convince them of his guilt beyond a reasonable doubt.

" 'Within this second state of mind (reasonable doubt) resulting in a "Not Guilty" verdict lies the distinction between the terms *not guilty* and *innocent*.

" 'Since a "Not Guilty" verdict can be predicated on the "gray zone" of uncertainty somewhere between a belief in innocence and the required proof of guilt, it would be incorrect to state that a conclusion of "Not Guilty" means that the jury believes the defendant is innocent. Although a verdict of "Not Guilty" certainly may be based upon a belief in the defendant's innocence, it just as certainly may be based on a hesitation in belief of guilty which amounts to a reasonable doubt in the minds of the jury.' " 238 Kan. at 362-63 (quoting Bugliosi, *Not Guilty and Innocent: The Problem Children of Reasonable Doubt*, 20 Ct. Rev. 16 [Winter 1983]).

We further noted in *Keeler*:

"The Advisory Committee on Criminal Jury Instructions recognized the problem in part and now PIK Crim. 2d 52.02 refers to a determination of 'whether the defendant is guilty or not guilty' rather than the earlier version which directs the jury to 'determine the innocence or guilt of the defendant.' " 238 Kan. at 363.

We concluded that "not guilty" was preferable language to "innocent." 238 Kan. at 364. Following *Keeler*, we hold that the provisions of PIK Crim. 3d 52.02 accurately reflect the law of this State and properly advise the jury in a criminal case of the burden of proof, the presumption of innocence, and reasonable doubt.

B. "Claims made by the State" rather than "elements of the crime."

The defendant argues that the use of "claims made by the State" in the burden of proof instruction rather than "elements of the crime" allows the jury to make a finding of guilt based on reasons other than whether the prosecution has carried its burden for each element of the crime. He asserts that this instruction violates his due process rights. We note that a similar argument was rejected in *State v. Pierce.*

A consideration of the instructions given in this case demonstrates that the instruction complained of properly and fairly states the law as applied to the facts in this case and further demonstrates that the jury could not reasonably have been misled by the instruction. Each time the trial court instructed on charges, it used the

language "[t]o establish this charge, each of the following *claims* must be proved." (Emphasis added.)

The trial court instructed the jury that "[i]f you have a reasonable doubt as to the truth of any of the *claims* made by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of any of the *claims* made by the State, you should find the defendant guilty." Clearly, the "claims made by the State" language refers directly to the "claims" the State must prove beyond a reasonable doubt to convict the defendant. The language used in the trial court's instruction clearly defines the responsibility of the jury. The language used is taken directly from PIK Crim. 3d 52.02. In *State v. Pierce*, 260 Kan. at 871, we approved the language used as a clear statement of the burden of the State in criminal trials. The trial court did not err in using the phrase "claims made by the State."

## IV. ADMISSION OF PHOTOGRAPHS

For his next point on appeal, Clark argues that the trial court erred in admitting autopsy photographs of the victim because they were unduly prejudicial. At trial, the defendant objected to certain photographs, including a blowup of the entry wound and the photographs of the exposed brain of the deceased. The State argued the coroner had requested the photographs to explain the path of the bullet. The court admitted the photographs, stating: "I'm making the assumption, then, that the coroner would answer the question that I just posed (that she selected them), yes."

The specific photographs objected to were 10A, 10C, 10D, 10G, 10H, and 10I. Exhibit 10C depicts Lynette Odanga on the autopsy table. 10A is a photograph of the exit wound. At trial, the coroner used 10C for identification purposes. 10F and 10E showed the bullet entrance wound to Lynette's temple. The coroner explained that the star shape of the wound was significant since it indicated a contact range gunshot wound. The coroner noted that 10E depicted a deposit of black soot or smoke discharge which had been blown into the underlying muscle. The coroner used 10A and 10B to illustrate the exit wound.

10D is a higher-powered magnification of the entrance wound after the skin was turned back so that the bone was revealed. The round hole was consistent with an entrance wound and the ring of black soot was an indicator of a contact wound.

10G, 10H, and 10I were used to illustrate the path of the bullet through the brain. Based upon examination, the coroner concluded that Lynette had died from a gunshot wound to the head with the gun muzzle in contact with the skin. The path of the bullet was from the front of the body slightly toward the back of the body from left to right.

Except as otherwise provided by statute, all relevant evidence is admissible. K.S.A. 60-407(f). Even where the defendant concedes the cause of death, the prosecution has the burden to prove all the elements of the crime charged and photographs to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant and admissible. *State v. Dargatz*, 228 Kan. 322, 329, 614 P.2d 430 (1980); *State v. Henson*, 221 Kan. 635, 647, 562 P.2d 51 (1977); *State v. Campbell*, 210 Kan. 265, 276, 500 P.2d 21 (1972).

Special care should be taken in admitting photographs taken after an autopsy in order that the evidence not be more gruesome than necessary. See *State v. Prouse*, 244 Kan. 292, Syl. ¶ 1, 767 P.2d 1308 (1989). When dealing with pictures of an autopsy, great care must be taken so that the pictures do not simply shock and revolt, but rather help the jury understand the medical testimony. *State v. Hartfield*, 245 Kan. 431, Syl. ¶ 9, 781 P.2d 1050 (1989). In a crime of violence which results in death, photographs which serve to illustrate the nature and extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death, even though they may appear gruesome. See *State v. Sutton*, 256 Kan. 913, Syl. ¶ 3, 889 P.2d 755 (1995); *State v. Hickles*, 261 Kan. 74, 929 P.2d 141 (1996).

All evidence that is derogatory to the defendant is by its nature prejudicial to the defendant's claim of not guilty. Evidence that actually or probably brings about a wrong result under the circumstances of the case is "unduly prejudicial." See *State v. Farrar*, 103

Kan. 774, 776, 176 Pac. 987 (1918). "Gruesome" is defined in Webster's II New Riverside University Dictionary 552 (1988) as "[c]ausing horror and repugnance: shocking." Photographs are unduly prejudicial and are erroneously admitted when they are unduly repetitious, are particularly gruesome, add nothing to the State's case, and bring about a wrong result. See *State v. Hickles*, 261 Kan. 74; *State v. Dargatz*, 228 Kan. at 329; *State v. Henson*, 221 Kan. at 646-47; *State v. Clark*, 218 Kan. 18, 24, 542 P.2d 291 (1975).

Although not pleasant to look at, the photographs here do not rise to the level of gruesomeness in *State v. Boyd*, 216 Kan. 373, 532 P.2d 1064 (1975). In *Boyd*, the autopsy photographs depicted the deceased victim "cut open from chin to groin and laid out like a disemboweled beef in a packing plant." 216 Kan. at 377. Here, the photographs were important in that they corroborated Shine's testimony as to the manner of Lynette's death and contradicted Clark's claim that the shooting was accidental. The fact that the wound was a contact wound was a critical fact in the State's case, and the photographs were true reproductions of relevant physical facts and material conditions brought into issue by the defendant. See *State v. Arteaga*, 257 Kan. at 889. The trial court did not err in admitting the photographs into evidence.

## V. SUFFICIENCY OF THE EVIDENCE

For his final point on appeal, Clark argues there was insufficient evidence to convict him of first-degree murder of Lynette and attempted first-degree murder of Shine. We have often stated the appellate standard of review concerning the sufficiency of the evidence. When the sufficiency of the evidence is challenged, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, an appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Johnson*, 255 Kan. 252, Syl. ¶ 6, 874 P.2d 623 (1994); *State v. Van Winkle*, 254 Kan. 214, Syl. ¶ 5, 864 P.2d 729 (1993); *State v. Ferguson*, 254 Kan. 62, Syl. ¶ 4, 864 P.2d 693 (1993).

Clark asserts that there was insufficient evidence of premeditation to convict him of first-degree murder and attempted first-degree murder. We have stated that premeditation and deliberation may be inferred from the established circumstances, if the inference is a reasonable one. *State v. Sanders*, 258 Kan. 409, 414-15, 904 P.2d 951 (1995). With respect to Lynette, Clark became angry at her at the club earlier in the evening. He told Jeff Peebles he had a gun and could "take care of it that way." Once back at the apartment, there was evidence Clark struck Lynette. After running out of the apartment, Clark pursued Lynette, walked up to her and stated, "I told you this would happen." The evidence also supported a reasonable inference that Clark pressed the muzzle of the gun against Lynette's left temple and pulled the trigger as she tried to defend herself. There was no evidence of a struggle for the gun. This evidence was sufficient to support a reasonable inference of premeditation.

With respect to Shine, there also was sufficient evidence of premeditation. Again, Clark was angry with Shine earlier in the evening. After the altercation with Shine in Lynette's apartment, Clark went into the bedroom. He took out a gun, loaded it, pointed the gun at Shine and stated, "This is what you get if you mess with me." After Shine ran out the door, Clark chased him, yelling, "[Y]ou are a dead black motherfucker." Clark then fired two shots at Shine.

After reviewing all the evidence, viewed in the light most favorable to the prosecution, we are convinced that there was sufficient evidence for a rational factfinder to find the defendant guilty beyond a reasonable doubt of each crime.

Affirmed.

SIX, J., concurring: I concur in the result but view the discussion of res gestae in Syllabus ¶ 7 and the corresponding portion of the opinion as unnecessary. I agree with the attempt in Syllabus ¶ 8 to rein in our application of res gestae. Lynette's prior statements of abuse were not admissible as part of the res gestae but, as the majority observes, as evidence of a discordant relationship bearing on motive and intent. Although Clark abandoned his hearsay ob-

jection on appeal, the statements were admissible under K.S.A. 60-460(d)(3).

I would return res gestae hearsay evidence analysis to the approach intended by the legislature's codification at K.S.A. 60-460. See *State v. Sanders*, 258 Kan. 409, 423, 904 P.2d 951 (1995) (Six, J., concurring); *State v. Jones*, 204 Kan. 719, 728-29, 466 P.2d 283 (1970); 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-460(d) (1979); Prater and Klemme, *Res Gestae Raises Its Ugly Head*, 65 J.K.B.A. 24 (Oct. 1996).