No. 84,007

STATE OF KANSAS, *Appellee*, v. ADRIAN ANGEL LOPEZ, *Appellant*.
(22 P.3d 1040)

Opinion filed April 20, 2001.

*Randall L. Hodgkinson*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the briefs for appellant.

*Robert D. Hecht*, district attorney, argued the cause, and *Joel W. Meinecke*, assistant district attorney, *Joan M. Hamilton*, former district attorney, and *Carla J. Stovall*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a direct appeal by the defendant, Adrian Angel Lopez, from his jury conviction of one count of premeditated first-degree murder. The trial court imposed a hard 40 sentence.

Carlos Martinez died on June 21, 1998, from injuries resulting from three gunshots to his head. The shots were fired from behind Martinez and to his right. One shot was fired within inches of Martinez' head, another within a foot, and the third from beyond a foot. The pattern of the shots being fired at varying distances is consistent with the gun staying in one place while the victim moved away from it. The coroner testified that Martinez, in all likelihood, lost consciousness instantly.

For approximately 3 years, Martinez had been the boyfriend of Kimberly Simon. Simon's 16-year-old daughter, Rachel Anguiano,

had been dating Lopez, the defendant, for approximately two years. Martinez knew Lopez.

Anguiano and Lopez spent the night of June 20, 1998, together at the Super 8 Motel. They quarreled. It was a very serious quarrel, which was not resolved to Lopez' satisfaction while they were at the motel. Their clothes were in one bag, and there was a handgun in the bag. Anguiano testified that she had not seen the gun before and she did not put it in the bag.

Late Sunday morning, June 21, Anguiano telephoned her mother to get a ride home for her and Lopez. Simon telephoned Martinez, who lived with his brother in North Topeka. Martinez went to the motel by himself to pick up Anguiano and Lopez.

Martinez was driving a 2-door car. The driver's door did not close properly, and Martinez used a bungee cord on the inside to hold it closed. Lopez got into the back behind Anguiano, who was in the front passenger seat, and Martinez drove. The bag was in the back with Lopez. Anguiano testified that Lopez wanted her to go home with him and continue their discussion, but she wanted Martinez to take Lopez home and then take her to where she lived with her mother.

As they were driving, Anguiano heard gunshots in rapid succession and out of the corner of her eye saw Martinez fall out of the car. She did not know how the car door got opened. The car continued moving after Martinez fell out. Anguiano did not have time to think because it all happened so fast. She made no effort to steer or brake. After traveling quite a distance, the car ran into a building. Anguiano was not hurt, and she got out of the car.

Anguiano testified that Lopez had their bag with him when he got out of the car. He threw it in a nearby dumpster. Lopez asked her if she was going to tell the police. She did not remember answering him. They ran approximately 5 blocks to where Lopez lived. Before going into his residence, Lopez told Anguiano to wait for him by the bridge. She did not. Instead, she waited outside for a few minutes and then ran to the Ramada Inn.

From the Ramada Inn, Anguiano telephoned Simon and asked to be picked up there. Approximately 10 minutes later, her mother

arrived with Anguiano's aunt. Anguiano told them Lopez had shot Martinez, and they drove to the hospital.

A family of four was driving in their car when the older brother heard gunshots and saw Martinez fall from his car. The car left the road, went through a wall bordering a parking lot, crossed the parking lot, and "slam[med] into the building." The witness estimated the speed of the driverless car at 30 to 35 m.p.h. After they turned around, the witness saw two people go to the car that had collided with the building, one of them reached in and grabbed something, then the two ran between some buildings away from the car.

Another witness was located by police from the license number supplied by the family of four. He saw Martinez fall from the car, and he saw the car strike the building. He reported that he saw a man and a woman in the back seat of the car and that the male was holding a gun and pointing it up.

Lopez did not testify at trial. The prosecutor played for the jury a videotaped statement given by the defendant to police. It is not a part of the record on appeal.

A young man named Darrik Forsythe, an admitted gang member with a criminal history, met Lopez in the Shawnee County Jail after Lopez had been taken into custody with regard to Martinez' death. Lopez talked to Forsythe through the vent. Forsythe testified: "He just told me that him and Carlos [Martinez] and his girlfriend was driving down the road and he was in the back, his girlfriend was in the front, they had broke up and he asked her to come back to the house and to smoke a joint with him and then she wouldn't answer him and he said that if she don't answer him before he gets to the end of the block, he's going to shoot Carlos in the head." Forsythe also testified that Lopez told him Anguiano "was going to die for snitching."

Lopez raises ten issues on appeal. Four of the issues deal with preliminary matters, one with the admission of evidence, three with instructions, and two with sentencing. We first consider whether the trial court abused its discretion in denying defendant's request for appointment of substitute counsel.

"Generally, the decision whether to appoint new counsel is a matter left to the trial court's discretion." *State v. Cromwell*, 253

Kan. 495, Syl. ¶ 3, 856 P.2d 1299 (1993). On this subject, the court also has stated:

"The lack of cooperation or communication between defendant and trial counsel does not in and of itself constitute a violation of the Sixth Amendment right to counsel. In the recent case of *State v. Cromwell*, 253 Kan. 495, 500, 856 P.2d 1299 (1993), the failure to appoint substitute counsel was raised on appeal, and we said: 'Irreconcilable conflict between a defendant and his attorney may, under certain circumstances, require the appointment of substitute counsel in order to protect a defendant's Sixth Amendment right to effective assistance of counsel.' We concluded:

" 'Although there was a substantial break in communication between defendant and his counsel, which, if not addressed, might have resulted in an irreconcilable conflict, the court restored communication between defense counsel and client, making it unnecessary to appoint substitute counsel. The defendant and his counsel took advantage of the three-week continuance to communicate with one another, and communication continued throughout all proceedings. Under these circumstances, we conclude that the trial court did not abuse its discretion in refusing to appoint substitute counsel.' 253 Kan. at 504." *State v. Ferguson*, 254 Kan. 62, 71, 864 P.2d 693 (1993).

In the present case, as prospective jurors were completing a pretrial questionnaire on Monday, April 26, 1999, the day trial was scheduled to begin, defendant and counsel met with the trial judge on preliminary matters. Lopez expressed insecurity "and stuff" with his appointed counsel and told the trial judge, "I'm just not ready for this trial." His chief complaint was that "[a]ll we talked about was just sentencing and taking the plea and that's it." He requested a different lawyer, saying, "I need someone to represent me like instead of someone just bringing me up to it and stuff to just take a plea for something I didn't do, that's no good. That's all he ever talked about. He didn't talk about a way out, a way in or nothing, just a plea."

Lopez' appointed counsel explained that another public defender (Wendell Betts) earlier had represented the defendant and had advised present counsel that he had "gone over the case with Mr. Lopez, had discussed the possible defenses to this case with Mr. Lopez." Present counsel then recounted his meetings and discussions with Lopez. His account contradicted defendant's assertion that a plea was their only topic of discussion. Referring to their first meeting, counsel stated that they had discussed "many, many

things . . . about what was going on and at that point in time when we talked about the defenses, we talked about, just about everything one could talk about for the case." Immediately after his first meeting with Lopez, counsel met with the prosecutor. Counsel reported back to Lopez that there was no possibility of reaching an agreement on a plea, which suited Lopez. On the Friday before trial was scheduled to begin on Monday, counsel, at the prodding of the trial judge, once more discussed a plea arrangement with the defendant. Counsel communicated to Lopez an offer that had been made by the prosecutor. No agreement was reached.

Counsel went on to give his account of the attorney-client communications and relationship:

"Also during that time what I was trying to do was get him prepared to testify at trial and after the two-hour conversation, I had a pretty good idea where we were at. I don't know what else he could have told me.

"As a matter of fact, the stuff that he has told me since that has just been redundant as to what he told us during that period of time. He sat down and went over the cases with me, discussed his testimony with me, and based upon that testimony I advised him of what I thought the outcome of this trial was basically going to be. . . . I think ethically I had an obligation to explain exactly how I thought this trial was going to play out and I did.

"I also explained to him some of the pitfalls of some of the other trials that are faced because obviously they are all related and in an attempt to explain to him what was happening, obviously I went over the potential maximum penalties that he's facing should he be convicted of all four of the cases that he is now being charged with.

"He has his own ideas, I have mine. We disagree on those. My problem is that I have—really don't want to represent clients that don't want me to represent them. I think in the long run we have more trouble with what's going on.

"So with that, I would move to the Court to allow me to withdraw and appoint Mr. Lopez an attorney who he is happy with or hopefully an attorney that will demonstrate to him that I did, in fact, have his best interests at heart and I think in the long run, it will show my judicial efforts and everything else. He hadn't really asked for any other attorneys or anything else. I think there probably has been a breakdown in the attorney/client relationship. I don't take responsibility for that but I can certainly understand why Mr. Lopez feels the way he does but I cannot subject my professional opinion to basically his wishes.

. . . .

"At this point in time obviously we are at odds at how this thing should play out and there is a complete breakdown. This is certainly a very, very strained relationship between myself and Mr. Lopez."

Given the opportunity to tell his side of the story, Lopez conceded, "[I]t is true what he said about coming and talking to me and stuff about the plea, about the consequences about it." Lopez, however, complained that after their initial discussion he misunderstood counsel's communications of plea offers in that he mistook which charges were involved. He concluded: "I just don't feel secure, you know, because I'm not ready for it."

The trial judge declined to appoint new counsel. The trial judge stated:

"[I]t is clear to me that the reasons that you are citing, and I have heard both your counsel and yourself explain to the Court that you don't feel you are prepared. . . . There has been more than ample opportunity for yourself and for your counsel to prepare for this case. Those questions were never brought to the Court's attention regarding preparation for trial here today, April 26th, 1999.

"The fact of the matter is, when you got appointed counsel, that does not give you a right to pick and choose your counsel. I have not heard anything that would suggest to me that the attorney/client relationship is so conflictive, so strained that this case should not continue. Based upon what I have heard, I'm going to deny your request, Mr. Lopez, and deny [counsel's] request for a continuance."

It appears that the trial court did not view the breakdown in communications as a matter serious enough to warrant delaying trial once again and at a time when potential jurors already had reported for service.

Then defense counsel, after consulting with cocounsel, asked the trial judge for the first time to consider whether Lopez was competent to stand trial. Defense counsel stated that it was not "until Mr. Lopez came forward this morning" with his request for another attorney that counsel really began to grasp the unrealistic nature of defendant's thinking. The heart of counsel's concern was that Lopez believed that God would intervene and conduct the trial so that the outcome would be favorable to Lopez:

"[W]hat he's basically saying is that he has conversations with God and that God tells him how things are basically going to be so it's not just a faith, that it goes one step beyond when they are actually, as I understand it, actually premonitions, you know, being able to see manifestations and things of this nature that really · are controlling all the decisions that he's making in regards to this case.

"I don't think he's really considering anything that I'm saying to him and I think some of the problems I'm having and some of the reason why he's so upset with me is [my] attempt[ing] to break down that barrier. . . .

. . . .

". . . I really do not think that he is capable in his present mental state that he can make an informed and intelligent decision based upon what I'm telling him. . . . Any lawyer who says anything different than what God is telling him is simply not going to be listened to and I just don't really think that he has really thought any, considered any statements that I have made to him. He will nod his head and he will do things but he's not listening. He's not making any decisions and those are the reasons."

Counsel did not believe that Lopez, in his mental state, was capable of communicating with him in order to assist in making a defense. Defense counsel asked for leave to withdraw, but it does not appear from his statements to the trial court that defense counsel believed that substitution of counsel would resolve the communications problem. In fact, counsel stated that any lawyer whose advice did not match that of God would not be listened to by Lopez. As will be seen in the discussion of the next two issues, however, the trial court determined that Lopez was competent to stand trial. The standard of this court's review is whether the trial court abused its discretion in denying the substitution of counsel, and it is not clear that the trial court did so in this case. The record shows that counsel and defendant continued talking to one another, even though their communications were less productive than could be hoped. Furthermore, because the request for substitution was not made until the morning trial was scheduled to begin, the trial court's action is not beyond the realm of reason. Judicial discretion is abused only when no reasonable person would take the view adopted by the trial court. *State v. Williams*, 268 Kan. 1, 8, 988 P.2d 722 (1999).

Defendant next argues that the trial court erred by not following the statutory procedure in determining he was competent to stand trial.

K.S.A. 22-3302 provides in part:

"(1) At any time after the defendant has been charged with a crime and before pronouncement of sentence, the defendant, the defendant's counsel or the prosecuting attorney may request a determination of the defendant's competency to stand trial. If, upon the request of either party or upon the judge's own knowledge and observation, the judge before whom the case is pending finds that there is reason to believe that the defendant is incompetent to stand trial the proceedings

shall be suspended and a hearing conducted to determine the competency of the defendant.

"(2) If the defendant is charged with a felony, the hearing to determine the competency of the defendant shall be conducted by a district judge.

"(3) The court shall determine the issue of competency and may impanel a jury of six persons to assist in making the determination. *The court may order a psychiatric or psychological examination of the defendant.* To facilitate the examination, *the court may*: (a) If the defendant is charged with a felony, commit the defendant to the state security hospital or any county or private institution for examination and report to the court, . . . ; (b) designate any appropriate psychiatric or psychological clinic, mental health center or other psychiatric or psychological facility to conduct the examination while the defendant is in jail or on pretrial release; or (c) appoint two qualified licensed physicians or licensed psychologists, or one of each, to examine the defendant and report to the court." (Emphasis added.)

Defendant complains that the trial court failed to follow the K.S.A. 22-3302(3)(c) procedure for having a defendant examined in that one physician rather than two examined defendant and reported to the court. Defendant concedes that the trial court has discretion whether to order professional evaluation. He contends, however, that once the trial court decides to order professional evaluation, it is required to follow the statutory procedure.

There is no support for defendant's argument in the statute or in cases in which the statute has been applied. By the express language of the statute, the trial court may order an examination of the defendant and may appoint two professionals in order to facilitate the examination. The trial court is required to do neither. Defendant argues that not requiring the trial court to appoint two professionals renders the pertinent part of K.S.A. 22-3302 meaningless, but this argument ignores the basic principle that a statute may be permissive rather than mandatory. In *State v. Green*, 245 Kan. 398, 781 P.2d 678 (1989), without the benefit of any professional evaluation, the trial court ruled that the defendant was competent to stand trial. This court affirmed. Referring to the statute, the court stated that "the option is merely permissive." 245 Kan. at 412. It is clear from the face of the statute that the option to appoint two professionals to examine a defendant, like the option to order an examination, is merely permissive.

In the circumstances of the present case, there is another reason for rejecting defendant's argument on appeal. Defense counsel approved the examination procedure followed by the trial court, and defense counsel even stated to the trial court that the procedure "would be in accordance with the statute." This court does not permit a defendant to lead a trial court into an action and then complain of it on appeal. *State v. Saleem*, 267 Kan. 100, 109, 977 P.2d 921 (1999).

Defendant also contends the trial court abused its discretion in determining that Lopez was competent to stand trial.

K.S.A. 22-3301 provides:

"(1) For the purpose of this article, a person is 'incompetent to stand trial' when he is charged with a crime and, because of mental illness or defect is unable:
(a) To understand the nature and purpose of the proceedings against him; or
(b) to make or assist in making his defense."

K.S.A. 22-3302 vests the trial court with authority to determine the question of a defendant's competence to stand trial. On appeal, this court's inquiry is limited to whether the trial court abused its discretion.

In the present case, during the discussion that included the subjects of substitution of counsel and defendant's competence to stand trial, the prosecuting attorney revealed that Lopez at some earlier date had been examined by a psychiatrist, who prepared a report. According to the prosecuting attorney, "[b]ased on the report, a notice of diminished capacity by virtue of mental disease or defect was withdrawn so the report's never been seen by the State but the defense has it and if there's support for this motion [for an evaluation of defendant's competence to stand trial] in that report, the Court should consider it." The trial judge expressed the firm view that Lopez was aware of the nature, purpose, and consequences of the criminal proceeding pending against him. The trial judge also expressed the view that Lopez probably was capable of assisting in his own defense. Referring to the psychiatrist's report mentioned by the prosecutor, however, the trial judge left the door open a crack: "If there is something in that report that would indicate otherwise, I would certainly want to be aware of that. Otherwise, we . . . are going to conduct jury selection."

Defense counsel told the court that he did not know what was in the report. Defense counsel reiterated his conviction that Lopez' delusions prevented him from assisting in his defense:

"[H]e is operating under the delusion that if he steps out in front of a bus, he's not going to die because God will save him and so any attempt to try to prepare him for trial, I'm not getting any cooperation whatsoever and this goes above and beyond just when he talks to you about any attempt God's coming to him in his dreams and everything else.

"That's what he is basing his entire life on are these dreams. They have taken complete control of his life to the extent that he is simply not going to assist me in any way because he does not need to."

Defendant spoke up, and, in a circuitous way, he told the trial judge that what concerned him about defense counsel's plea negotiations with the State was that they involved all the charges against him, not just those in the present case. The trial judge responded: "And that very statement indicates to me that you are capable of assisting in your defense and understand the nature of this and what's at stake here." The trial judge then announced that he would deny defense counsel's request for a determination of defendant's competence to stand trial.

Apparently not entirely satisfied with the trial court's consideration of the matter, the prosecuting attorney then made the following suggestion: "We have the services of Doctor Horne available at the jail and I think he's available or could be upon the Court's request almost instantly. Could he be seen this evening and go ahead with the trial if he's seen this evening and make sure we have some fresh opinion from the medical doctor?" Defense counsel stated that the procedure suggested by the prosecutor "would be in accordance with the statute." The trial judge agreed: "I think that's a good idea and just to be on the safe side, I'll allow that and order . . . Doctor Horne . . . to conduct his assessment this evening if we could get that arranged." It was agreed among counsel and the trial court that the jury would not be sworn in until later. Within a half-hour, the trial judge met again with counsel to announce that Dr. Horne would meet with Lopez during the lunch hour to examine and evaluate him. In the early afternoon, the trial judge reconvened the conference with counsel

and defendant. The trial judge read Dr. Horne's report into the record: " 'April 26th, 1999. Aware of charges and consequences, alert, oriented, cooperative, low normal intelligence, tenth grade dropout, poorly educated. No evidence of psychosis or organic brain damage. Able to cooperate with attorney in own defense.' " On the basis of his own observation of the defendant and of Dr. Horne's report, the trial judge determined that Lopez was competent to stand trial.

On appeal, Lopez argues that Dr. Horne's examination was insufficiently thorough to support the district court's finding that defendant was competent. He cites several federal cases and cases from other states' courts to support his position that Dr. Horne's examination was too cursory to be reliable. In each of the cases he cites, a death sentence had been imposed. Each of the cases also is distinguishable from the present case on other material grounds. In the district court, defense counsel merely told the judge of difficulty in communicating with the defendant. It actually was the prosecuting attorney's suggestions that Lopez undergo examination by Dr. Horne, and it was the prosecuting attorney who advised the court that Lopez previously had been evaluated with a diminished capacity defense in mind. It does not appear from the record that Lopez ever furnished evidence of lack of competence to the trial court or proffered evidence in this court. In these circumstances, there is no basis on which this court can find that the trial court abused its discretion in ruling that Lopez was competent to stand trial.

Defendant next argues that it was reversible error for the trial court, without the defendant being present, to confer with counsel about the questionnaire responses of 10 potential jurors and to question a prospective juror in chambers with counsel present.

The Sixth Amendment's Confrontation Clause and the Due Process Clause of the Fourteenth Amendment require a defendant's presence at every critical stage of a trial. See *State v. Bell*, 266 Kan. 896, Syl. ¶ 7, 975 P.2d 239 (1999). In addition, K.S.A. 2000 Supp. 22-3405(1) provides: "The defendant in a felony case shall be present at the arraignment, at every stage of the trial including the

impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by law."

Lopez was absent for two distinct episodes. The first occurred before the venire persons were placed under oath to be examined as to their qualifications to sit as jurors. See K.S.A. 22-3408(2)(a); K.S.A. 60-247(b). The second occurred during voir dire.

The first incident of defendant's absence occurred when the court and counsel discussed some prospective jurors' answers to a questionnaire requested by defendant for the purpose of flushing out potential jurors with significant familiarity with pretrial publicity about the case. The completed questionnaires were screened by the trial judge, and ten were selected for consideration by the court with counsel. One potential juror was excused on the basis of his prior knowledge of the facts of the case, as demonstrated in his questionnaire answers. Another of the 10 potential jurors already had been excused by the trial court due to time constraints. The eight other prospective jurors were placed near the end of the list of veniremen and retained pending further inquiry.

The State contends that the conference Lopez missed was not a "stage of the trial" protected by the statute or the constitution. Without deciding the question, it may be noted that no cases have been brought to the court's attention in which a proceeding preliminary to voir dire and conducted in chambers has been treated as a stage of the trial. With regard to which proceedings require the presence of the defendant, the court has named "all times when the jury is present in the courtroom and whenever the court communicates with the jury." *State v. Garcia*, 233 Kan. 589, Syl. ¶ 2, 664 P.2d 1343 (1983). Both *Garcia* categories involve the jury; hence, it is obvious that screening potential jurors' questionnaires falls into neither. K. S. A. 22-3405(1) expressly includes "the impaneling of the jury," and in *Garcia* the court also stated that defendant's presence is required where "essential to a fair and just determination of a substantial issue." Screening of questionnaires for the purpose of identifying potential jurors to be placed on the venire list is not the impaneling of a jury nor is it essential to a determination of a substantial issue. Here, the screening conference among the trial court and counsel on the record is not a stage

of the trial within the meaning of the statute. There was no error in the court proceeding without the defendant present.

The second incident of Lopez' absence occurred at 8:55 a.m. in chambers on the second day of trial. Voir dire was not completed on Monday afternoon. Before proceedings resumed in the court-room on Tuesday morning, the trial judge and counsel convened in the conference room. The trial judge stated: "The defendant is not present. Do you waive his appearance for this inquiry, [defense counsel]?" Defense counsel answered, "Yes, sir." Also present in the conference room was a potential juror, who had been seated the previous afternoon. The following discussion took place:

"THE COURT: Thank you. I have asked [M.A.] who is Juror No. 2, seated in seat number two, to come in and have a discussion, brief discussion with counsel and it has come to my attention through one of the victim's family, the Martinez family, that you may know one of the family members and I want to inquire about that.

"Ms. Hamilton, what is the name?

"MS. HAMILTON: Tom.

"THE COURT: Do you know a Tom Martinez; think about it for a second. You may know one of the family members.

"[M.A.]: Maybe if I see the face because I have got relatives or maybe they are my cousins but I don't actually know them or talk to them. We have kind of got, I mean—

"THE COURT: Let me explain something. The purpose of this inquiry is to ensure the impartiality and I don't think anybody asked if they were related to the family or knew some of the family, the Martinez family, so I'll allow an inquiry about that just briefly.

"MS. HAMILTON: Just to be clear, it said that there might be a knowledge of it. They didn't know for sure but they wanted to bring it to our attention. There was a question in the survey that indicated do you know anybody in the family so we wanted to bring it out front because the Martinez' [sic] did.

"[M.A.]: They recognize me then?

"MR. BANDY: They probably did. Of course, my only concern was, is like I said, obviously if he is selected as a juror and he later determines he does know one of the family, that untenable situation we would all hate to be in so in an abundance of caution I thought we would go ahead and do this. Obviously Tom Martinez can't be real close friends, is that correct?

"[M.A.]: Right, I mean, if—

"THE COURT: You might not recognize him? That's fine. That ends my inquiry. Any other questions?

"MR. BANDY: No.

"MR. MEINECKE: If I may, [M.A.], if during the course of the trial or the proceedings later this morning you see somebody out there in the audience whom you recognize, would you let the Judge know?

"[M.A.]: Okay.

"THE COURT: Obviously, in my mind, counsel, the fact that a juror may recognize someone is not necessarily even relevant to whether they can sit impartially and based upon what I understand about your relationship this family member, while you may recognize them, it's obvious there's not a relationship there that would affect the partiality here and I will make that call at this point and allow him to still pass for cause.

"MS. HAMILTON: That would be the question; even if you find out that you do know somebody, will you be able to judge the case still very fair and open-minded.

"[M.A.]: Yes. I would hope so, I mean—

"THE COURT: That's all we can ask. Thank you very much and you go be seated in your chair and we'll get started here.

"MR. MEINECKE: The State does not object to what the Court has done.

"MR. BANDY: And likewise from the defendant."

After the conference in chambers ended, jury selection resumed in the courtroom with the defendant present. [M.A.] eventually was sworn as a juror to hear this case.

Voir dire was in progress at the time [M.A.] was questioned in chambers. There is no doubt that the inquiry occurred during the impaneling of the jury and was a stage of trial in which the defendant had a right to be present.

It appears from the transcript of the conference that defense counsel and the trial judge believed that counsel could effectively waive the defendant's right to be present. Lopez disagrees and relies on *State v. Sandstrom*, 225 Kan. 717, 595 P.2d 324, *cert. denied* 444 U.S. 942 (1979). In *Sandstrom*, the record showed that counsel "advised the court that [defendant] had waived her right to be present." 225 Kan. at 721. There is a difference between counsel's conduct in *Sandstrom* and in the present case. There, counsel told the court that Sandstrom had waived her right; here, counsel purported to waive Lopez' right for him. Here, defense counsel responded in the affirmative when the trial judge asked defense counsel if he waived defendant's right to be present. On the basis of the record before this court, Lopez did not waive his right to be present.

With Lopez being absent for the questioning of a venireman and no waiver being shown of record, error is apparent. The remaining question is whether the error requires reversal of Lopez' conviction.

This court in the past has stated that the denial of the right to be present at all critical stages of trial "is subject to a harmless error analysis." *State v. McGinnes*, 266 Kan. 121, Syl. ¶ 3, 967 P.2d 763 (1998). However, in our recent decision in *State v. Calderon*, 270 Kan. 241, 13 P.3d 871 (2000), we rejected the harmless error analysis where a defendant's right to be present at trial has been denied. Calderon required an interpreter, and he was provided an interpreter right up to closing argument. "Closing arguments were made in English and without the use of an interpreter for the defendant." 270 Kan. at 246. After a lengthy discussion of the formula articulated by Justice Rehnquist in *Arizona v. Fulminante*, 499 U.S. 279, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991), for distinguishing between trial error, which would be subject to harmless error analysis, and structural error, which would not, this court made the following summary:

"In the same year that *Brecht* was decided, the United States Supreme Court in *Sullivan v. Louisiana*, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993), again encountered an issue where the trial/structural error dichotomy failed. In *Sullivan*, the defendant had been convicted of first-degree murder and sentenced to death on the basis of a defective reasonable doubt jury instruction. . . . In a unanimous decision authored by Justice Scalia, the Court held that such an instruction could not constitute harmless error. . . .

" . . . After deciding the case on the basis of the Sixth Amendment to the United States Constitution, the Court recognized *Fulminante*, characterizing it as '[a]nother mode of analysis lead[ing] to the same conclusion that harmless-error analysis does not apply.' 508 U.S. at 281, 113 S. Ct. 2078. The Court reasoned:

'Denial of the right to a jury verdict of guilt beyond a reasonable doubt is certainly an error of the former [structural] sort, the jury guarantee being a "basic protectio[n]" whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function [citation omitted]. . . . The deprivation of that right, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as "structural error." ' 508 U.S. at 281-82, 113 S. Ct. 2078.

"The United States Supreme Court and lower courts have struggled with the *Fulminante* trial/structural error dichotomy and found that not all errors can be analyzed within the structure. The right to be present at one's criminal trial is a

fundamental right. To be 'present' requires that a defendant be more than just physically present. It assumes that a defendant will be informed about the proceedings so he or she can assist in the defense. A defendant's right to be present includes a right to have trial proceedings translated into a language that he or she understands so that he or she can participate effectively in his or her own defense." 270 Kan. at 252-53.

This court concluded that

"the trial court denied Calderon a meaningful presence during closing argument, an error which implicates the basic consideration of fairness. Under these circumstances, this court is not permitted to determine that it was harmless beyond a reasonable doubt even though the error might have had little, if any, likelihood of having changed the result of the trial." 270 Kan. at 253.

Hence, the majority did not reject the *Fulminante* dichotomy but determined that the harmless error rule did not apply to absence at the closing argument. We concluded that closing argument "implicates the basic consideration of fairness" and denied Calderon a meaningful presence at a critical stage of his trial. 270 Kan. at 252-53.

Here, Lopez was not denied a meaningful presence at a critical stage of his trial, nor did his absence at the time the juror was questioned in chambers implicate the basic consideration of fairness or undermine the function of a criminal trial. This is not a "structural error" and thus is subject to the harmless error analysis.

"Before an error of constitutional magnitude may be declared harmless, the appellate court must be able to decide beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial." *State v. McGinnes*, 266 Kan. 121, Syl. ¶ 3. In this case, only one potential juror was excused on the basis of his answers to the pretrial publicity questionnaire. It is quite likely that the potential juror would have been excused if he had been retained to participate in voir dire. If his knowledge of media reports had been revealed during voir dire, the contents of the media reports might have been discussed, thus spreading the information to other potential jurors, just as defense counsel hoped to prevent by requesting the pretrial questionnaire. On the other hand, if the concern is that potential jurors were not excused at the conference, no harm has been shown in that none of the

potential jurors discussed ultimately served as jurors in this case. With regard to the first incident of Lopez' absence, we decide beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial.

Lopez' absence for the questioning of [M.A.] has the appearance of a potential for prejudice. The subject of the inquiry was the potential juror's acquaintance with a relative of the victim which, if true, might be a matter of serious concern to defendant. [M.A.], however, denied recognizing anyone, said that he would inform the court if he changed his mind, and assured the trial judge that he would be fair and open-minded even if he realized he knew someone.

Thus, no prejudice has been shown as a result of Lopez' absence from the conference. The error was harmless.

The evidentiary issue raised by Lopez involves a letter found by Simon in her daughter's room. It was found by Simon in Anguiano's room approximately 3 days before Simon testified at trial. Simon testified that the letter was in an envelope with Shawnee County Jail as the return address and had arrived by mail. On the day she testified, Simon gave the letter to the prosecutor.

Anguiano admitted receiving the letter. She estimated its time of arrival at "a couple weeks ago." To the question "Do you recognize the handwriting on the letter?" Anguiano responded: "I don't know. I guess it was Angel's but when we was together he used to write different." When asked if Exhibit 63 constituted the entire letter, she replied: "I don't know. I guess it's the whole letter." Pressed for a definite answer, Anguiano said, "Yeah, it's the whole letter."

When the State offered the letter into evidence, defendant objected and the trial court took the matter under advisement. A short time later, the trial court admitted the letter:

"The record should reflect I have considered both the defendant's and the State's position with regard to this document and the Court will allow its admission into evidence. It has been identified, counsel then can argue its merit or for what it's worth in terms of its contents and its supposed origin. It has, in my mind at least, satisfied—it's been identified by the receiver of this document, it's been identified by Ms. Simon as the one who brought it here and its origin was iden-

tified through Ms. Simon's testimony, at least what she recollects the envelope saying.

"Based upon that identification, I think it at least can come in for the jury's consideration. The rest of it goes to the weight of its contents."

On appeal, defendant contends that the State did not lay an adequate foundation for admission of the letter and that, because the letter was "extremely prejudicial," its admission requires reversal. The letter is not a part of the record on appeal.

This court's standard of review regarding a trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. The party asserting that the trial court abused its discretion bears the burden of showing that the action was arbitrary, fanciful, or unreasonable. *State v. Lumley*, 266 Kan. 939, 950, 976 P.2d 486 (1999).

Without having the letter in the record, the court is not in a position to assess defendant's argument that reversal is required due to the extremely prejudicial content of the letter. Appellant has the burden of furnishing a record that affirmatively shows that prejudicial error occurred in the trial court. Without an adequate record, this court will not presume prejudice. See *State v. Valdez*, 266 Kan. 774, 792, 977 P.2d 242 (1999). Moreover, in the circumstances of this appeal, the inadequate record would seem to interfere with the court's ability to judiciously determine whether the trial court's action in admitting the letter was reasonable or not. Thus, in the absence of a record that shows that the content of the letter was prejudicial and the trial court's action was unreasonable, the court can find no merit to Lopez' complaint.

As previously noted, the defendant raises three issues relating to the instructions. He first argues that the trial court should have instructed the jury on the lesser offenses of involuntary manslaughter based on recklessness and voluntary manslaughter based on an honest but unreasonable belief in self-defense.

Although the transcript of the instruction conference reveals that there was discussion of lesser offenses, it showed neither a request that the particular instructions identified on this appeal be given nor an objection that they were not given. In the absence of request

or objection, the clearly erroneous standard applies. *State v. Humphery*, 267 Kan. 45, 62, 978 P.2d 264 (1999).

The evidence in the record on appeal does not support either of the requested instructions. The evidence that Lopez cites in support of the manslaughter instructions is his videotaped statement to police. The videotaped statement is not a part of the record on appeal. Lopez bears the burden of furnishing a record that affirmatively shows prejudicial error. He failed to do so in this instance.

He next contends the instruction on burden of proof was misleading. The burden of proof instruction given by the trial court in this case is identical to the instruction approved by this court in *State v. Clark*, 261 Kan. 460, 473, 931 P.2d 664 (1997). In *Clark*, the court rejected two arguments about the instruction—the claim that the instruction did not accurately convey the constitutional right to the presumption of innocence, and the claim that the phrase "claims made by the State" was misleading. With regard to the second contention, the court stated:

> "The trial court instructed the jury that '[i]f you have a reasonable doubt as to the truth of any of the *claims* made by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of any of the *claims* made by the State, you should find the defendant guilty.' Clearly, the 'claims made by the State' language refers directly to the 'claims' the State must prove beyond a reasonable doubt to convict the defendant. The language used in the trial court's instruction clearly defines the responsibility of the jury. The language used is taken directly from PIK Crim. 3d 52.02. In *State v. Pierce*, 260 Kan. at 871, we approved the language used as a clear statement of the burden of the State in criminal trials. The trial court did not err in using the phrase 'claims made by the State.' " 261 Kan. at 476.

It does not appear from examination of the argument made in the present case that any matter not settled by the *Pierce* and *Clark* decisions was raised in the trial court. The trial court overruled defense counsel's objection with the comment that it was a pattern instruction.

It may be noted that the pattern instruction has been changed slightly since *Clark*. The second paragraph of the current version of the pattern instruction states:

> "The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims

*required to be proved* by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of any of the claims *required to be proved* by the State, you should find the defendant guilty." (Emphasis added.) PIK Crim. 3d 52.02.

The italicized phrases replaced the word "made" in the version scrutinized in *Clark*. It has not been argued that the version of the pattern instruction given by the trial court had been superseded at the time of trial. Nor has it been argued that the current version of the pattern instruction resolved defendant's concerns.

Defendant's third objection is that the trial court's instruction on voluntary manslaughter erroneously required the jury to find beyond a reasonable doubt that the killing was done in the heat of passion.

The trial court instructed the jury on the lesser offense of voluntary manslaughter based on the heat of passion. The instruction stated:

"To establish this charge, each of the following claims must be proved:
"1. That the defendant intentionally killed Carlos Martinez;
"2. That it was done in the heat of passion; and
"3. That this act occurred on or about the 21st day of June, 1998, in Shawnee County, Kansas."

Defense counsel did not object to the instruction. Without an objection at trial, this court considers the question for clear error only. In this case, the jury convicted Lopez of premeditated first-degree murder. The jury did not have occasion even to consider the elements instruction of the lesser offense. We find no error.

Lopez raises two issues as to his hard 40 sentence. The trial court imposed a hard 40 sentence upon finding the aggravating circumstance that defendant knowingly or purposely created a great risk of death to more than one person and determining that the aggravating circumstance was not outweighed by mitigating factors. On appeal, Lopez challenges the sufficiency of the evidence supporting the aggravating factor and the trial court's determination that mitigating factors did not outweigh the aggravating circumstance.

Aggravating circumstance. Where the sufficiency of the evidence for establishing an aggravating circumstance under the hard 40 statute is challenged, the standard of review is whether, after a

review of all the evidence viewed in the light most favorable to the State, a rational factfinder could have found by a preponderance of the evidence the existence of the aggravating circumstance. *State v. Spain*, 263 Kan. 708, Syl. ¶ 6, 953 P.2d 1004 (1998).

The trial court's recitation of the evidence he considered in finding the aggravating circumstance is as follows:

"[T]he repeated firing of a deadly weapon in extreme[ly] close quarters like the inside of an automobile—and directed at the driver of the automobile and I think the evidence is clear that the car was traveling at least a normal rate of speed with flow of traffic, on a well-traveled public roadway. This was not a quiet side street. This was Fourth Street in Topeka, Kansas, right near the fire department, and other vehicles are traveling the same time.

"Again, Rachel Anguiano was less than two feet away as you shot and killed Carlos Martinez and at nearly point blank range. It's just that action that created a risk of death. When you combine it with the fact that this was a moving vehicle that jumps curbs, strikes and crashes into a brick building, in my mind that creates a great risk for anyone who is sitting in the front seat of that car which includes Rachel Anguiano."

On appeal, Lopez insists that Anguiano was not at risk from gunfire. With regard to the moving, driverless car, Lopez concedes that a rational factfinder might conclude that shooting the driver of a moving vehicle created a risk of a collision, but he argues that "many other outcomes exist." Thus, he contends that the trial court's finding was based on speculation.

Lopez' argument seems to be that the risk he created is not a risk within the meaning of the statutory aggravating circumstance because it was not a foregone conclusion that the death of more than one person would result. His argument redefines "risk" and renders a significant part of the statute meaningless. K.S.A. 21-4636 specifies eight aggravating circumstances that the sentencing court may find to exist. The one relevant in this case is: "The defendant knowingly or purposely killed or created a great risk of death to more than one person." K.S.A. 21-4636(b). Lopez would have the court remove the risk from "risk" by transforming it from creation of a possibility of an occurrence to causation of an occurrence. Lopez would have the court break our rule of construction requiring that ordinary words be given their ordinary meanings. See *Director of Taxation v. Kansas Krude Oil Reclaiming Co.*, 236

Kan. 450, 455, 691 P.2d 1303 (1984). An additional problem is that the unavoidable consequence of redefining risk as Lopez advocates would be the elimination of the alternative phrase "or created a great risk of death" from the statute. The resulting aggravating circumstance would be: The defendant knowingly or purposely killed . . . more than one person. This court presumes that the legislature did not intend to enact meaningless provisions. See *KPERS v. Reimer & Koger Assocs., Inc.*, 262 Kan. 635, 643, 941 P.2d 1321 (1997). The arguments made by Lopez with regard to the sufficiency of the evidence supporting the sentencing court's finding of this aggravated circumstance are without merit. A rational factfinder could have found by a preponderance of the evidence the existence of the aggravating circumstance.

Mitigating circumstances and weighing circumstances. K.S.A. 21-4637 specifies eight mitigating circumstances, but does not limit consideration to those circumstances. "The standard of review as to the eight statutory mitigating circumstances differs from that for the aggravating circumstances in that they are viewed in a light most favorable to the defendant." 263 Kan. at 720.

In this case, Lopez presented the statutory mitigating circumstance of "[t]he age of the defendant at the time of the crime." K.S.A. 21-4637(g). Lopez was 19 at the time he murdered Martinez. He contends that his young age was a significant factor in this crime because he was immature, had not learned to exercise good judgment, and had not learned skills for coping with the stress he experienced from his rocky relationship with Anguiano. His argument is less than convincing for several reasons. First, he was 19—young, but not so young that he did not understand the consequences of his actions. Moreover, the immaturity he describes is not necessarily linked with age and, in fact, is a factor in many crimes regardless of the age of the perpetrator. In other words, the immaturity Lopez describes is separate and distinct from chronological age. He cites cases from other states' courts but no Kansas cases for the proposition that age should be a mitigating factor when immaturity or senility causes the defendant to lack substantial judgment in committing the crime. Kansas case law does not differ. The immaturity referenced in the proposition is the youthful coun-

terpart of senility, a condition in which age affects ability to exercise judgment. The immaturity referenced is not a mere disregard for the well-being of other people.

Lopez also contends that several other statutory mitigating circumstances apply. K.S.A. 21-4637(a) provides: "The defendant has no significant history of prior criminal activity." The defendant's overall criminal history classification is D, which means that "[t]he offender's criminal history includes one adult conviction or juvenile adjudication for a person felony, but no adult conviction or juvenile adjudications for a nonperson felony." K.S.A. 21-4709. The trial judge stated that he also took into consideration that at the time of sentencing in this case Lopez had just been bound over for trial on a charge of aggravated intimidation of a witness, a person felony. K.S.A. 21-4637(b) provides: "The crime was committed while the defendant was under the influence of extreme mental or emotional disturbances." Lopez directs the court's attention to evidence that he was upset by the trouble in his relationship with Anguiano, and he suggests that evidence sufficient to support instructing the jury on voluntary manslaughter based on heat of passion required the trial court to find that this mitigating factor applied. He also claims that the same evidence required the trial court to find the mitigating factor that "[t]he defendant acted under extreme distress or under the substantial domination of another person." K.S.A. 21-4637(e).

Where a trial court's refusal to find a mitigating circumstance under K.S.A. 21-4637 is challenged by the defendant, the standard of review is whether, after a review of all the evidence, viewed in a light most favorable to the defendant, a rational factfinder could have found by a preponderance of the evidence the existence of the mitigating circumstance. 263 Kan. at 720. In the present case, there was no refusal. The trial court did not identify applicable mitigating circumstances, and the trial court is not required to do so. *State v. Gideon*, 257 Kan. 591, 609, 894 P.2d 850 (1995). The trial court simply announced that the aggravating circumstances were not outweighed by mitigating circumstances. A trial court's weighing of aggravating and mitigating circumstances is within its sound discretion and will not be disturbed on appeal where de-

fendant has not shown an abuse of discretion. *State v. Spain*, 269 Kan. 54, Syl. ¶ 1, 4 P.3d 621 (2000). Lopez has not shown an abuse of discretion.

Lopez also argues that a jury must find beyond a reasonable doubt that the aggravating factor exists before the court can impose a hard 40 sentence. Since Lopez' briefs were filed, this court has considered and determined this question contrary to the arguments he presents. This issue is decided by the court's opinion in *State v. Conley*, 270 Kan. 18, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001). Syl. ¶ 3 of that decision states:

"Imposition of the K.S.A. 21-4638 hard 40 sentence based on a fact not found by the jury does not increase a defendant's maximum sentence of imprisonment for life imposed under K.S.A. 21-4706(c). The hard 40 sentence limits the lower end of the sentence. Defendant's hard 40 sentence violates neither the Due Process Clause of the United States Constitution, nor his right to trial by jury under the 6th Amendment to the United States Constitution or § 5 of the Kansas Constitution Bill of Rights."

The judgment of the district court is affirmed.